M. Henry Martuscbllo, J.
The main application here involved is the proceeding brought by petitioner, Rebecka Peters, for an order pursuant to article 78 of the Civil Practice Act to declare as null and void a resolution of the New York City Housing Authority, adopted December 11, 1952, requiring as a condition of occupancy in Federally aided projects that the applicant or tenant sign a certificate of nonmembership in organizations designated as subversive by the Attorney General of the United States.
By separate application petitioner asks that the respondent authority be stayed from requiring any tenant to sign a certificate of nonmembership in an organization designated as subversive, pending the hearing of this proceeding and any appeal from an order of this court or any appellate court.
An additional application is made by the International Workers Order, Inc., Joseph Feldman, Helen Bobroff, Isidore Slitzan, Joseph Serota, Carlos Dore and Paul Herzberg for leave to intervene in the article 78 proceeding pursuant to section 1298 of the Civil Practice Act.
As part of the program to remedy the acute shortage of decent, safe and sanitary dwellings for persons of low income, Congress by the enactment of the United States Housing Act of 1937, as amended (U. S. Code, tit. 42, § 1401 et seq.) provided for Federal assistance to the States and created a United States Housing Authority (now called Public Housing Administration) with power to make loans and annual contributions to the public housing agencies in the States which sought to take *944 advantage of these statutes. Pursuant to the Public Housing Law of the State of New York, the New York City Housing Authority was created for the purpose of providing low-rent housing for low income groups. Under these laws, the Public Housing Administration is authorized to lend to the Authority an amount not in excess of 90% of the final development cost of the project and also to make annual contributions to the Authority over a long period of years. The New York City Housing Authority is now operating 10 completed projects containing 13,554 apartments, constructed under the United States Housing Act of 1937. The rental payable for an apartment varies with the income of the tenant. Thus, in Federally-aided projects the rental for the same three-room apartment varies from $26 per month (for a family income of $1,381 per annum) to $50 per month (for a family income of between $2,821 and $2,940); and for a five-room apartment the rental for the same apartment will vary from $30 per month (for a family income of less than $1,381) to $67 per month (for a family income of between $3,901 and $4,020).
The projects, and the substantial benefits to the occupants from such modest rentals, are possible only as a result of the financial assistance of the Federal Government. With respect to the selection of tenants, the authority is requested to select tenants for its project but subject to the terms of any loan or subsidy contract with the Government. Congress, in order to implement the contracts made by the Public Housing Administration with the local housing authorities, appropriates funds which pay for the required payments. In making such appropriations Congress has frequently made various legislative determinations and has imposed conditions and terms with respect to the appropriations. In connection with the adoption of the Independent Offices Appropriations Act of 1953 (66 U. S. Stat. 403), Congress approved a provision of such act (commonly called the Gwinn Amendment) reading as follows: ‘1 Provided- further, That no housing unit constructed under the United States Housing Act of 1937, as amended, shall be occupied by a person who is a member of an organization designated as subversive by the Attorney General: Provided further, That the foregoing prohibition shall be enforced by the local housing authority, and that such prohibition shall not impair or affect the powers or obligations of the Public Housing Administration with respect to the making of loans and annual contributions under the United States Housing Act of 1937, as amended.” (U. S. Code, tit. 42, § 1411c.)
*945 To implement the Gwinn Amendment and in compliance with directions and regulations of the Public Housing Administration the New York City Housing Authority adopted the following resolution: ‘ ‘ Whereas, the Public Housing Administration issued regulations relating to the enforcement of the Gwinn Amendment which were received by the Authority on or about December 1, 1952; and Whereas, the Gwinn Amendment and the regulations issued by the Public Housing Administration relating thereto require that the prohibition of the Gwinn Amendment be enforced by the Authority: Now, Therefore, be it Hereby Resolved by the Members of the New York City Housing Authority as folloAvs: Section 1. Additional Qualifications for Eligibility. In addition to all other standards now or hereafter provided in any Authority resolution for eligibility for admission to or continued occupancy in any federally-aided project, the following qualifications are hereby established: (a) No dAvelling unit in any federally-aided project shall be occupied by any person who is a member of an organization designated as subversive by the Attorney General of the United States, (b) No applicant shall be admitted to, and no tenant shall be permitted to continue to reside in, any dwelling unit in a federally-aided project unless such applicant or tenant has signed a certificate, at the time and in the form required by the Authority, to the effect that neither the applicant or tenant nor any person Avho occupies, or is to occupy, the dwelling is a member of an organization designated as subversive by the Attorney General of the United States. Section 2. Termination of Tenancy, (a) Failure to Furnish Certificate. Upon the failure or refusal of a tenant in a federally-aided project to execute and furnish to the Authority the certificate referred to in section 1 of this resolution, the Manager of the project in Avhich the tenant resides shall, without further notice and Avithout the necessity for any further authorization, immediately commence proceedings for the termination of such tenancy and the eviction of the tenant. The' period of the notice to vacate to be served upon the tenant shall be the minimum period required by laAV. Upon the expiration of such notice to vacate, the Manager shall immediately institute summary proce'edings for the eviction of the tenant.”
In support of her application petitioner Peters specifically alleges that she received a letter from the authority dated January 14,1953, reading in part as follows: ‘ ‘ Enclosed is a copy of a certificate which each tenant residing in a Federal project must sign. Before signing this certificate, please read carefully, or have someone read to you, the attached list of the organizations *946 designated as subversive by the Attorney General and have each member of your household read it. The certificate must be signed by a person whose name appears on the lease, by the man of the household if at all possible. The signature must be witnessed by a person over 21 years of age, either a member of your family or some, one else, who must sign his or her name in the space marked ‘ Witness ’ and who must give his address. You must sign the enclosed certificate and return it to this office, properly witnessed, in order to be found eligible to continue in residence in this project. If yon fail to sign the certificate, we shall be compelled to start legal action for your removal. Signed certificates should be returned to the Management Office, by mail or in person, on or before February 1, 1953.”
The certificate mentioned in the authority’s letter which is to be signed by the tenants reads in part as follows: “ Certification of Non-Membership in Subversive Organizations. I hereby certify that I am not a member of any of the organizations listed in the document entitled ‘ Consolidated List, Dated November 10,1952, of Organizations Designated by the Attorney General of the United States as Within Executive Order No. 9835,’ attached hereto, and that, to the best of my knowledge, information, and belief, no person who occupies or is to occupy the housing accommodations in connection with which this certificate is furnished (that is, the accommodations in the public housing project in which I now reside or for which I am making, or have made, application) is a member of any such organization. I hereby further certify that I have carefully read or have read- to me, the document referred to in the preceding sentence.”
It is the petitioner’s contention that the action of the New York City Housing Authority in adopting the above resolution requiring the execution by the tenants of a certificate of non-membership in the listed subversive organizations is arbitrary, capricious and unreasonable in that the rights of the petitioner guaranteed by the Federal Constitution are violated in the following respects: The list of the Attorney General is a bill of attainder forbidden by sections 9 and 10 of article I of the Federal Constitution; the list was promulgated without notice and hearing, in violation of the Fifth Amendment of the Federal Constitution, and its adoption by the authority was a violation of the Fourteenth Amendment; the Attorney General has no authority with or without hearing to publish the list and the action of the authority in adopting the same and requiring *947 a certificate violates petitioner’s rights under the First Amendment. The relief prayed for is (1) the resolution be annulled, and (2) the authority be restrained from taking action to evict petitioner.
The respondent authority, on the other hand, asserts that the ultimate constitutional question as to the validity of the Gwinn amendment need not be reached since (1) this proceeding, which attempts to set aside as unconstitutional a resolution adopted in compliance with the determination of the Congress, may not be maintained under article 78 of the Civil Practice Act; (2) petitioner has no standing to bring this proceeding since she does not allege that she is a member of an organization designated as subversive; (3) that the constitutionality of and the use of the list of the Attorney General may not be challenged in this proceeding to which neither the Attorney General nor any Federal officer is a party and no member of any designated organization may maintain this action at least until it has been decided in an action by the organization itself against the Attorney General that its name should be stricken from the list; (4) the action taken by the respondent authority with respect to admission or continued occupancy in the projects in compliance with the mandate of the Congress and the regulation issued by the Public Housing Administration, is not arbitrary or capricious and this court should decline jurisdiction, especially since no agency or officer of the Federal Government is made a party.
While, as pointed out above, the respondent authority contends that the basic constitutional questions need not be reached, it is the position of the authority that it was within the power of the Congress to determine that occupancy in the low-rent housing projects, the great benefits of which are made possible by subsidies and public funds, should be denied to members of the designated subversive organizations.
As a preliminary objection to petitioner’s application, the respondent authority urges that since the petitioner has failed to allege she is a member of a designated subversive organization she has no standing to ask for a review of the resolution adopted by the housing authority. It would seem to me that petitioner may properly refuse to admit membership in one of the listed subversive organizations in her verified petition. (Blau v. United States, 340 U. S. 159.) In any event, since I am of the opinion that the tenants, Joseph Feldman, Carlos Dore and Joseph Sarata, who have admitted membership in one of the listed organizations in their petitions, should be permitted to *948 intervene (Matter of Zorach v. Clauson, 195 Misc. 531) this defect in the Peters’ petition, if it be considered such, is cured by the allegations in the intervenors ’ petitions.
Petitioner Peters asserts, and I think rightly so, that her refusal to sign the certificate subjects her to almost immediate eviction and that she is therefore an aggrieved person within the purview of article 78 of the Civil Practice Act with the concomitant right to challenge the validity of the Grwinn Amendment and the regulations and resolution implementing the same. The same may be said to be true of the intervenors.
In discussing this question of legal injury giving rise to a “ standing to sue,” Mr. Justice Frankfurter in Anti-Fascist Committee v. McGrath (341 U. S. 123, 152, 156), significantly stated: ‘ ‘ the existence of 1 legal ’ injury has turned on the answer to one or more of these questions: (a) Will the action challenged at any time substantially affect the ‘ legal ’ interests of any person? (b) Does the action challenged affect the petitioner with sufficient ‘ directness ’? (c) Is the action challenged sufficiently ‘ final ’? * * * ‘ Finality ’ is not, however, a principle inflexibly applied. If the ultimate impact of the challenged action on the petitioner is sufficiently probable and not too distant, and if the procedure by which that ultimate action may be questioned is too onerous or hazardous, ‘ standing ’ is given to challenge the action at a preliminary stage.”
As was also stated in Columbia System v. United States (316 U. S. 407, 425): “ The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control.”
Applying these principles to the ease at bar, it would appear that petitioners’ eviction is sufficiently imminent to warrant the court in taking jurisdiction of this article 78 proceeding. Moreover, since the case presents issues of vital concern and importance to the community generally, the court should disregard these purely technical objections and should resolve the main and basic questions raised by the petitions. (Matter of Kuhn v. Curran, 294 N. Y. 207, 213.)
The respondent Authority also contends that this proceeding, which attempts, without making any Federal officer or body a party, lo set aside the resolution of the Authority adopted in compliance with the determination by Congress (the Gwinn Amendment), may not be maintained under article 78 of the *949 Civil Practice Act. This contention is without merit. Article 78 states that the expression in the article “ ‘ [T]o review a determination ’ ” refers to the relief heretofore available in a certiorari or a mandamus proceeding for the review of any act or refusal to act of a body or officer exercising * * * administrative or corporate functions, which involves an exercise of judgment or discretion.” (Civ. Prac. Act, § 1284, subd. 2.)
Here the petitioners (Peters and others) are not asking for a review of the acts of any Federal body or officer in the administration of the Federal laws, but rather are seeking merely to review an administrative ruling made by a State agency in carrying out its functions as mandated by the provisions of a Federal statute, i.e., the Gwinn Amendment. There seems to be no doubt that even though a Federal law is involved this court has jurisdiction to decide the issues presented by the petitions. (Claflin v. Houseman, 93 U. S. 130.) There the court said at (pp. 136-137): “The general question, whether State courts can exercise concurrent jurisdiction with the Federal courts in cases arising under the Constitution, laws, and treaties of the United States, has been elaborately discussed, both on the bench and in published treatises, sometimes with a leaning in one direction and sometimes in the other, but the result of these discussions has, in our judgment, been, as seen in the above cases, to affirm the jurisdiction, where it is not excluded by express provision, or by incompatibility in its exercise arising from the nature of the particular case. * * * So rights, whether legal or equitable, acquired under the laws of the United States, may be prosecuted in the United States courts, or in the State courts, competent to decide rights of the like character and class; subject, however, to this qualification, that where a right arises under a law of the United States, Congress may, if it see fit, give to the Federal courts exclusive jurisdiction.”
No cogent consideration appears, therefore, why any Federal body or officer need be joined as a party to these proceedings.
We are thus brought to a consideration of petitioners’ principal contention that the action of the Authority in adopting the resolution is arbitrary, capricious and unreasonable for the reason that it is based upon an act of Congress which is unconstitutional. Of course, in determining whether the resolution is arbitrary, capricious or unreasonable, we start with the presumption that the congressional act involved its constitutional. It “ 1 can be declared unconstitutional only when it can ho shown beyond reasonable doubt that it conflicts with the *950 fundamental law, and that until every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible, the statute will be upheld.’ ” (Matter of Fay, 291 N. Y. 198, 207.)
Petitioners cite the cases of United States v. Lovett (328 U. S. 303); Cummings v. State of Missouri (4 Wall. [U. S.] 277); Ex parte Garland (4 Wall. [U. S.] 333) and the recent decision in Wieman v. Updegraff (344 U. S. 183) as authority for the proposition that the Gwinn Amendment is a bill of attainder. As was stated in Garner v. Los Angeles Bd. (341 U. S. 716, 722): 11 Bills of attainder are ‘ legislative acts * * * that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial * * # ’ United States v. Lovett, 328 U. S. 303, 315 (1946). Punishment is a prerequisite.”
It would appear, in the light of the foregoing definition, that the Gwinn Amendment has the characteristics of a bill of attainder. But I am of the opinion that a true bill of attainder, as intended by the framers of the Constitution, must involve punishment for past conduct, and that a legislative act imposing standards of qualifications and operating prospectively, as is the case with the Gwinn Amendment, does not come within the constitutional ban. Support for this view may be found in Garner v. Los Angeles Bd. (supra); Communications Assn. v. Douds (339 U. S. 382, 414) and, also, Gerende v. Election Bd. (341 U. S. 56, 57); see, also, opinion of Mr. Justice Frankfurter in United States v. Lovett (supra, pp. 321-324).
In the Wieman v. Updegraff case (344 U. S. 183, supra) the Supreme Court, holding an Oklahoma statute to be offensive to due process and therefore unconstitutional because it barred teachers for disloyal activities engaged in during a five-year period prior to its enactment, refused to pass upon the validity of that part of the statute which was similar in character to the one at bar, stating (p. 192): “ Because of this disposition, we do not pass on the serious questions raised as to whether the Act, in proscribing those communist front or subversive organizations’ designated as such on lists of the Attorney General of the United States, gave fair notice to those affected, in view of the fact that those listings have never included a designation of ‘ communist fronts,’ and have in some cases designated organizations without classifying them. Nor need we consider the significance of the differing standards employed in the preparation of those lists and their limited evidentiary use under the Federal Loyalty Program.”
*951 Petitioners also contend that the Gwinn Amendment and the Housing Authority’s resolution violate petitioners’ rights of freedom of speech guaranteed by the First Amendment of the Federal Constitution; also the due process clauses in the Fifth and Fourteenth Amendments.
Apparently, the Gwinn Amendment was the means adopted by Congress to deal with the problem of infiltration by subversive groups in low-rent housing projects and the use of such projects as “ breeding grounds ” or “ cells ” for the organization and activities of such groups. Choice of the measures to cope with an apparent evil is for the Congress, which is presumed to have acted with reason, not from caprice. (Matter of Stubbe v. Adamson, 220 N. Y. 459; Communications Assn. v. Douds (supra, pp. 400, 401.)
Obviously, the Government is under no duty to provide bounties in the form of low-rent housing accommodations for its citizens. If it elects to do so, however, it cannot arbitrarily prevent any if its citizens from enjoying these statutorily created privileges. Nor can it make the privilege of their continuance dependent upon conditions that would deprive any of its citizens of their constitutional rights. A government is without power to impose an unconstitutional requirement as a condition for granting a privilege, even though the privilege may have been the use of government property. (Frost Trucking Co. v. Railroad Comm., 271 U. S. 583.) In the latter case, the court said (pp. 593-594): “ It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.” (See, also, Hague v. C. I. O., 307 U. S. 496, 515, 516; Murdock v. Pennsylvania, 319 U. S. 105, 114.)
The Fifth Amendment, in the field of Federal activity, and the Fourteenth, with respect to State action, do not prohibit governmental regulation for the public welfare. They merely condition the exercise of such regulatory power by requiring that the end shall be accomplished by methods consistent with due process, and that the regulations shall not be unreasonably arbitrary or capricious. (Nebbia v. New York, 291 U. S. 502.) *952 There the court said (p. 525): “ The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.” The function of the courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. (Nebbia v. New York, supra.)
It seems clear that Congress, in enacting the Gwinn Amendment, had in mind excluding persons who advocate the overthrow of our Government by force and by violence, from enjoying the bounties granted by the low-rent housing acts. Actually, Congress did not do this. What Congress did was to exclude all persons who are members of organizations designated as subversive by the Attorney General, based upon the latter’s ex parte findings of subversiveness. No notice or opportunity to be heard is provided for in Executive Order 9835 to the organizations listed to disprove these findings. That fact was admitted by the pleadings in Joint Anti-Fascist Refugee Committee v. McGrath (104 F. Supp. 567). There the court said (p. 572): “With respect to the admitted fact that there was no adequate notice or hearing, the cases are now in precisely the same posture that they were when considered by the Supreme Court.”
It is to be observed that the certificate quoted above requires the tenant to certify that he is not a member of “ any of the organizations listed in the document entitled ‘ Consolidated List, Dated November 10,1952, of Organizations Designated by the Attorney General of the United States as Within Executive Order No. 9835.’ ” Significantly, this list does not mention the character of the organizations which are named. The President’s Executive Order No. 9835 established March 21, 1947 states: “3. The Loyalty Review Board shall currently be furnshed by the Department of Justice the name of each foreign or domestic organization, association, movement, group or combination of persons which the Attorney General, after appropriate investigation and determination, designates as totalitarian, fascist, communist or subversive, or as having adopted *953 a policy of advocating or approving the commission of acts of force or violence to deny others their rights under the Constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means.” (12 Federal Register 1935.)
In Joint Anti-Fascist Refugee Committee v. McGrath (supra) three organizations included in a list of groups designated as communist by the Attorney General under the above Executive Order brought actions for injunctive and declaratory relief to have their names deleted from these lists upon various constitutional grounds. The majority of the court reversed the lower court’s dismissal of the complaint, expressing several different views. Clark, J., took no part in the case. Burton, J., with Douglas, J., concurring, held that on the facts alleged in the complaint the Attorney General’s action was patently arbitrary.
The reasoning of at least four of the Justices, Frankfurter, J., Jackson, J., Douglas, J., and Black, J., clearly indicates that they believe that the manner in which the designation of the subversive organizations was complied by the Attorney General violated the due process clause of the Fifth Amendment of the Federal Constitution. Mr. Justice Frankfurter stated (pp. 161-162): “ Yet, designation has been made without notice, without disclosure of any reasons justifying it, without opportunity to meet the undisclosed evidence or suspicion on which designation may have been based, and without opportunity to establish affirmatively that the aims and acts of the organization are innocent. It is claimed that thus to maim or decapitate, on the mere say-so of the Attorney General, an organization to all outward-seeming engaged in lawful objectives is so devoid of fundamental fairness as to offend the Due Process Clause of the Fifth Amendment.
‘ ‘ Fairness of procedure is ‘ due process in the primary sense. ’ Brinkerhoff-Faris Co. v. Hill, 281 U. S. 673, 681. It is ingrained in our national traditions and is designed to maintain them. In a variety of situations the Court has enforced this requirement by checking attempts of executives, legislatures, and lower courts to disregard the deep-rooted demands of fair play enshrined in the Constitution. ‘ [T]his court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in ‘1 due process of law ’ ’ as understood at the time of the adoption of the Constitution. One of these principles is that no person shall be deprived of his liberty without opportunitiy, at some time, to be heard * * * ’ The *954 Japanese Immigrant Case, 189 U. S. 86, 100-101. £ [B]y “ due process ” is meant one which, following the forms of law, is appropriate to the case, and just to the parties to he affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and wherever it is necessary for the protection of the parties, it must give them an opportunity to be heard respecting the justice of the judgment sought. ’ Hagar v. Reclamation District, 111 U. S. 701, 708. £ Before its property can be taken under the edict of an administrative officer the appellant is entitled to a fair hearing upon the fundamental facts. ’ Southern R. Co. v. Virginia, 290 U. S. 190, 199. ‘ Whether acting through its judiciary or through its legislature, a State may not deprive a person of all existing remedies for the enforcement of a right, which the State has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it.’ Brinkerhoff-Faris Co. v. Hill, supra, 281 U. S. at page 682.” At page 647: “ The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights.”
Mr. Justice Douglas (pp. 175-177, 178-179) says: “ This is not an instance of name calling by public officials. This is a determination of status — a proceeding to ascertain whether the organization is or is not £ subversive. ’ This determination has consequences that are serious to the condemned organizations. Those consequences flow in part, of course, from public opinion. But they also flow from actions of regulatory agencies that are moving in the wake of the Attorney General’s determination to penalize or police these organizations. An organization branded as ‘ subversive ’ by the Attorney General is maimed and crippled. The injury is real, immediate, and incalculable.
1 ‘ The requirements for fair trials under our system of government need no elaboration. A party is entitled to know the charge against him; he is also entitled to notice and opportunity to be heard. Those principles were, in my opinion, violated here-
£ £ The charge that these organizations are £ subversive ’ could be clearly defined. But how can anyone in the context of the Executive Order say what it means? It apparently does not necessarily mean £ totalitarian, ’ £ fascist ’ or £ communist ’ because they are separately listed. Does it mean an organization with socialist ideas? There are some who lump Socialists *955 and Communists together. Does it mean an organization that thinks the lot of some peasants has been improved under Soviet auspices? Does it include an organization that is against the action of the United Nations in Korea? Does it embrace a group which on some issues of international policy aligns itself with the Soviet viewpoint? Does it mean a group which has unwittingly become the tool for Soviet propaganda? Does it mean one into whose membership some Communists have infiltrated? Or does it describe only an organization which under the guise of honorable activities serves as a front for Communist activities?
“ No one can tell from the Executive Order what meaning is intended. No one can tell from the records of the cases which one the Attorney General applied. The charge is flexible; it will mean one thing to one officer, another to someone else. It will be given meaning according to the predilections of the prosecutor: 1 subversive ’ to some will be synonymous with ‘ radical ’; ‘ subversive ’ to others will be synonymous with ‘ communist. ’ It can be expanded to include those who depart from the orthodox party line — to those whose words and actions (though completely loyal) do not conform to the orthodox view on foreign or domestic policy. These flexible standards, which vary with the mood or political philosophy of the prosecutor, are weapons which can be made as sharp or as blunt as the occasion requires. Since they are subject to grave abuse, they have no place in our system of law. When we employ them, we plant within our body politic the virus of the totalitarian ideology which we oppose.
11 It is not enough to know that the men applying the standard are honorable and devoted men. This is a government of laws, not of men. '* * * The system used to condemn these organizations is bad enough. The evil is only compounded when a government employee is charged with being disloyal. Association with or membership in an organization found to be ‘ subversive ’ weighs heavily against the accused. He is not allowed to prove that the charge against the organization is false. That case is closed; that line of defense is taken away. The technique is one of guilt by association — one of the most odious institutions of history. The fact that the technique of guilt by association was used in the prosecutions at Nuremberg does not make it congenial to our constitutional scheme. Guilt under our system of government is personal. When we make guilt vicarious we borrow from systems alien to ours and ape our enemies. Those short-cuts may at times seem to serve noble aims; but we depreciate ourselves by indulging in them. *956 When we deny even the most degraded person the rudiments of a fair trial, we endanger the liberties of everyone. We set a .pattern of conduct that is dangerously expansive and is adaptable to the needs of any majority bent on suppressing opposition or dissension.”
The dissenting opinion written by Reed, J., and concurred in by Vinson, C. J., and Minton, J., holds that due process was not involved in the Anti-Fascist Committee v. McGrath case, because the designations by the Attorney General did not determine any guilt on the part of the listed organizations nor did it have any finality in deciding the loyalty of the members of such organization. The dissenting opinion states in part (pp. 205-206): “.It seems clearly erroneous to suggest that ‘ listing ’ determines any 1 guilt ’ or ‘ punishment ’ for the organizations or has any finality in determining the loyalty of members. The President and the Attorney General pointed this out. It is written into the Code of Federal Regulations, 5 CFR § 210.11(b) (6).”
It is to be noted that the Gwinn Amendment provides that no low-rent housing unit shall be occupied by a member of an organization designated as subversive by the Attorney General. Such a legislative mandate should be based on a finding that the organizations listed have been found to be subversive after a hearing granting all the safeguards of due process as understood by our courts since the time of the adoption of the Federal Constitution. No such hearing is provided for by Executive Order 9835 nor by the Gwinn Amendment.
Following either the reasoning of the Justices who held in the Anti-Fascist Committee v. McGrath case that the designation by the Attorney General violates the due process clause, or that of the dissenting Justices that the listing does not finally determine the guilt of the organization or of their members, we must conclude that the designation of these organizations as subversive for the purpose of the Gwinn Amendment violates the due process clause in the Fifth Amendment.
That the doctrine of due process is also applied to administrative rulings was so held in Morgan v. United States (304 U. S. 1). There the plaintiff attacked an order of the Secretary of Agriculture fixing the rates to be charged by market agencies. •The court stated (pp. 14-15). “The vast expansion of this field of administrative regulation in response to the pressure of social needs is made possible under our system by adherence to the basic principles that the legislature shall appropriately determine the standards of administrative action and that in administrative proceedings of a quasi-judicial character the *957 liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand ‘ a fair and open hearing, ’— essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process. Such a hearing has been described as an ‘ inexorable safeguard.’ ”
I might also point out that one of the controlling reasons why the Feinberg Law was upheld by the Supreme Court of the United States in Adler v. Board of Educ. (342 U. S. 485), was that the statute afforded each one who sought appointment or retention in the public school system an opportunity to present evidence to meet the presumption that proof of membership in one of the listed subversive organizations was prima facie evidence of disqualification.
In the light of the foregoing, I am of the opinion that the G-winn Amendment and the resolution adopted by the Housing-Authority implementing the same depart radically from our prevailing concepts of fairness, and do not afford due process of law. Since Congress has imposed an unconstitutional requirement as a condition for occupancy in these low-rent housing projects, it would seem to me that the resolution of the Authority is arbitrary, capricious and unreasonable. (Frost Trucking Co. v. Railroad Comm., 271 U. S. 583, supra.) Furthermore, I do not think the petitioners need surrender any of their rights guaranteed by the Federal Constitution in order to enjoy the privileges afforded by these low-rent housing acts. (Western Union Tel. Co. v. Kansas, 216 U. S. 1, 47.)
The application of the petitioners, Peters, Feldman, Dore and Serata, to annul the determination of the New York City Housing Authority is granted. The application of International Workers Order, Inc., Helen Bobroff, Isidore Slitzan and Paul Herzberg for leave to intervene is denied, for the reason that they have not established that they are “ specially and beneficially interested” in annulling the determination made by the Authority (Civ. Prac. Act, § 1298). Any right that the International Workers Order, Inc., may have to intervene in the proceeding appears to be academic in view of the affirmance by the Court of Appeals (Matter of People [Int. Workers Order), 305 N. Y. 258) of the order obtained by the Superintendent of Insurance of the State of New York dissolving such corporation upon the ground that its continued activities are hazardous in a financial sense to its policyholders.
The application for a stay is dismissed.
Settle order on notice.