Argued September 6, reversed November 15, 1961, petition for
rehearing denied March 13, 1962, United States Supreme
Court denied certiorari October 15, 1962

# DICKMAN ET AL *v.* SCHOOL DISTRICT
## NO. 62C ET AL
### 366 P. 2d 533

*John D. Mosser,* Portland, and *F. Leo Pfeffer,* New York City, argued the cause for appellants. With them on the briefs was Steve Anderson, Salem.

*Paul R. Biggs,* Oregon City, and *Roy F. Shields,* Portland, argued the cause and submitted a brief for defendants-respondents and intervenor-respondent. With them on the brief were F. Leo Smith and Randall B. Kester, Portland.

Robert Y. Thornton, Attorney General, and Catherine Zorn, Assistant Attorney General, Salem, submitted a brief amicus curiae in support of ORS 337.150.

Before McALLISTER, Chief Justice, and ROSSMAN,

WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

O'CONNELL, J.

This is a suit in equity brought by plaintiff taxpayers against School District No. 62C, its board and clerk, to enjoin defendants from supplying textbooks without charge for the use of pupils enrolled in St. John's The Apostle School, a parochial school maintained and operated by the Catholic church. Plaintiffs also seek a judicial declaration that the so-called free textbook statute (ORS 337.150), under which distribution was made to the St. John's school and other parochial schools, does not authorize defendants to supply textbooks free of charge to church or parochial schools, or if the statute is so construed that it be declared unconstitutional.

Ivan B. Carlson, a resident within School District No. 62C, whose children were enrolled in the St. John's school intervened.

The statute in question, ORS 337.150, reads as follows:

"337.150 (1) Each district school board shall, in the manner specified in ORS 328.520 and 328.525, provide textbooks, prescribed or authorized by law, for the free and equal use of all pupils residing in its district and enrolled in and actually attending standard elementary schools or grades seven or eight of standard secondary schools.

"(2) For the purpose of ORS 328.520, 328.525 and 337.150 to 337.250 a school shall be standard when it meets the standards of the State Board of Education, except with respect to those standards applying to the ratio of pupils to the acre of school site, the square feet of classroom floor space per

pupil and the ratio of pupils to teachers in class-rooms, and when all teachers engaged in class-room instruction in said school hold a valid Oregon teaching certificate of the proper teaching level. The holding of such a teacher's certificate shall be evidenced by annual registration with the county school superintendent of the county in which the school is situated."

Plaintiffs attack the constitutionality of the statute on four grounds; (1) it authorizes state aid to religion at public expense in violation of the First Amendment to the United States Constitution as made applicable to the states by the Fourteenth;[1] (2) the furnishing of such textbooks constitutes a benefit to religious institutions contrary to the provisions of Article I, § 5 of the Oregon Constitution;[2] (3) it, in effect, imposes a tax for a non-public purpose and thus deprives plaintiffs of property without due process of law, and (4) it authorizes the expenditure of money not exclusively for the support and maintenance of the common schools and is, therefore, in violation of Article VIII, § 2 of the Oregon Constitution.[3]

---

[1] The First Amendment provides as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

[2] Article I, § 5 provides: "No money shall be drawn from the Treasury for the benefit of any religeous (sic), or theological institution, nor shall any money be appropriated for the payment of any religeous (sic) services in either house of the Legislative Assembly."

[3] Article VIII, § 2 provides: "The proceeds of all the lands which have been, or hereafter may be granted to this state, for educational purposes (excepting the lands heretofore granted to, and [aid] in the establishment of a university) all the moneys, and clear proceeds of all property which may accrue to the State by escheat, or forfeiture, all moneys which may be paid as exemption from Military duty, the proceeds of all gifts, devises and bequests, made by any person to the State for common school

Plaintiffs rely principally upon the first two grounds in attacking the constitutionality of the statute. The trial court held ORS 337.150 constitutional. Plaintiffs appeal.

For a period of several years the defendant district has furnished free textbooks for the use of the pupils of St. John's school. In a period of three school years these books have cost the district approximately $4,000. The books were purchased by the district from money in its General Fund, a part of which was derived from taxes levied upon real property in the district, including real property owned by plaintiffs. Books furnished by the district under ORS 337.150, whether to public or to parochial schools, are delivered to the persons in charge of the schools—not to the pupils individually. The district also furnishes teacher's editions of each text. The district retains title to the books, a matter of little practical significance however, because the books are not ordinarily retrieved by the district. Textbooks furnished for the use of parochial school students do not differ from those delivered to public schools. A school is not entitled to receive free text-

---

purposes, the proceeds of all property granted to the State, when the purposes of such grant shall not be stated, all proceeds of the five hundred thousand acres of land to which this State is entitled by the provisions of an act of Congress, entitled *'An act to appropriate the proceeds of the Sales of the public lands, and to grant premption (sic) rights, approved the fourth of Setember 1841'* and also the five per centum of the Net proceeds of the Sales of the public lands, to which this State shall become entitled on her admission into the union (if Congress shall consent to such appropriation of the two grants last mentioned) shall be set apart as a seperate (sic), and irreducible fund to be called the common school fund, the interest of which togather (sic) with all other revenues derived from the school lands mentioned in this section shall be exclusively applied to the support, and maintenance of common schools in each School district, and the purchase of suitable libraries, and apparatus therefor."

books unless it complies with standards established by
the Oregon statutes as implemented by administrative
regulation. The St. John's school met these standards.

The evidence establishes, and the trial judge found,
that the purpose of the Catholic church in operating
the St. John's school and other similar schools under
its supervision is to permeate the entire educational
process with the precepts of the Catholic religion. The
study guides used by the teachers in St. John's school
indicate that, to some extent at least, the use of the
textbooks furnished by the district is inextricably con-
nected with the teaching of religious concepts. These
study guides were prepared by the superintendent of
schools of the Archdiocese of Portland. There is no
doubt that the teaching of the subject matter in this
manner in a public school would be contrary to law.[④]

Defendants first challenge plaintiffs standing to
raise any constitutional issue other than the violation
of the due process clause of the Fourteenth Amend-
ment. Plaintiffs have not shown, it is argued, a depri-
vation of any freedom guaranteed by the First Amend-
ment since they do not sue as school children, parents
of school children, or as persons whose own religious
liberty is threatened. As will appear below, we have
chosen to decide the issues presented in this case solely
upon the basis of the Oregon Constitution. It is not
necessary, therefore, to decide whether under federal
law defendants' contention with respect to standing
is sound.[⑤]

---

[④] Annotation 45 ALR2d 742 (1956); Annotation 141 ALR 1144
(1942); Annotation 5 ALR 866 (1920). See Note, 41 Va L Rev
789, 795-98 (1955); Note, 47 Colum L Rev 1346 (1947).

[⑤] Everson v. Board of Education, 330 US 1, 67 S Ct 504, 91
L Ed 711, 168 ALR 1392 (1946) recognized the standing of a tax-
payer to assert the First Amendment in contesting state expendi-
tures for parochial schools. See, Jaffe, Standing to Secure Judicial
Review: Public Actions, 74 Harv L Rev 1265 (1961).

The question of plaintiffs' standing to assert Article I, § 5 in this cause is not directly raised by defendants. The Oregon cases on standing do not provide us with a clear guide. It has been held that for some purposes at least a person contesting a public expenditure must plead and prove that the threatened action probably will result in a general increase in taxation.[⊙] Plaintiffs did not expressly allege in their complaint that the expenditures made by the defendant district increase the tax burden upon them or upon taxpayers generally, although the claim that such an increase occurs might be inferred from the allegations that plaintiffs are taxpayers, that public moneys were appropriated and expended in the purchase of textbooks for distribution to St. John's school and that this "constitutes the imposition of a tax."[⊘] The precise question of whether a taxpayer has standing to contest the expenditure of public moneys for the support of religious education has been passed upon by other courts. In some of the adjudicated cases the taxpayer has been accorded standing even in the absence of allegation or proof that he will be damaged in a pecuniary way.[⊙] And there is support for the proposi-

[⊙] Morris v. City of Salem et al, 179 Or 666, 174 P2d 192 (1946). Cf., State ex rel Durkheimer v. Grace, 20 Or 154, 25 P 382 (1890). State ex rel Shaw v. Ware, 13 Or 380, 10 P 885 (1886). See also, Portland Gen. Elec. Co. v. Judd, 184 Or 386, 401-404, 198 P2d 605, 612-613, 6 ALR2d 547 (1948), which distinguishes cases holding that a taxpayer has no standing to attack election procedures from cases holding that a taxpayer may restrain an illegal expenditure of public funds. There is some confusion as to whether a representative suit instituted for the benefit of the public at large must be brought by or in the name of the State of Oregon or the appropriate state agency. Compare Terwilliger Land Co. v. City of Portland, 62 Or 101, 123 P 57 (1912) with Gosso v. Riddell, 123 Or 57, 261 P 77 (1927), and Vinton v. Hoskins, 174 Or 106, 147 P2d 892 (1944).

[⊘] Accord Berghorn v. Reorganized School Dist. No. 8, 364 Mo 121, 260 SW2d 573 (1953).

tion that the problem of standing will be overlooked when an issue of unusual importance is presented.[8]

■ In the instant case the issue of plaintiffs' standing was not raised by defendants' pleadings. If standing were a jurisdictional matter then, of course, defendants could raise the question at any stage in the proceedings. But we do not so regard it and we hold, therefore, that defendants' failure to raise the issue by a proper pleading constitutes a waiver of that issue.[9]

The First Amendment, as interpreted in *Everson v. Board of Education,* 330 US 1, 67 S Ct 504, 91 L Ed 711, 168 ALR 1392 (1946) and Article I, § 5 of the Oregon Constitution prohibit the use of state funds for the benefit of religious institutions. The principal issue presented to us is whether the expenditure of public funds by the defendant school district for the purpose of furnishing textbooks free of charge to pupils of a parochial school is within these constitutional prohibitions.

■ We have concluded that the expenditure authorized by ORS 337.150 is within the proscription of

---

[8] See for example, Chance v. Mississippi State Textbook Rating & Purchasing Bd., 190 Miss 453, 200 So 706 (1941); Mitchell v. Consolidated School Dist., 17 Wash2d 61, 135 P2d 79, 146 ALR 612 (1943). In some cases the question of standing is not discussed. Rawlings v. Butler, 290 SW2d 801 (Ky 1956); Smith v. Donahue, 202 App Div 656, 195 NYS 715 (1922); Gerhardt v. Heid, 66 N D 444, 267 NW 127 (1936); Swart v. South Burlington Town School Dist., — Vt —, 167 A2d 514 (1961) (United States Supreme Court appeal pending).

[9] Kuhn v. Curran, 294 NY 207, 61 NE2d 513, rehearing denied 294 NY 963, 63 NE2d 188 (1945), followed in Elkind v. City of New Rochelle, 163 NYS2d 870 (1957); Peters v. New York City Housing Authority, 128 NYS2d 224 (1953), *modified,* 283 App Div 801, 128 NYS2d 712 (1954); 3 Davis, Administrative Law § 22.09, p. 246 (1958).

[10] See Portland Gen. Elec. Co. v. Judd, 184 Or 386, 394, 396, 198 P2d 605, 609, 610 (1948). See also, 3 Davis, Administrative Law § 22.01, pp. 209-210 (1958).

Article I, § 5 of the Oregon Constitution. It is unnecessary, therefore, to consider plaintiffs' contention that the statute violates also the First or Fourteenth Amendments to the United States Constitution. Nor is it necessary to consider whether Article VIII, § 2 of the Oregon Constitution has been violated.

■ Article I, § 5 prohibiting the use of public moneys "for the benefit of any religious or theological institution," was designed to keep separate the functions of state and church and to prevent the influence of one upon the other. In this respect our constitution follows the general pattern of other state constitutions and may be regarded as expressing, in more specific terms, the policy of the First Amendment as it has been explained in the Everson case.[10]

The historical setting in which constitutional provisions such as Article I, § 5 were written and the factors which prompted their adoption have been thoroughly explained elsewhere; it is not necessary, therefore, to restate those observations here.[11] We need only say that we regard the separation of church and state no less important today than it was at the time Article I, § 5 and its counterpart in other constitutions were adopted.[12]

---

[10] For various types of constitutional provisions see 50 Yale L J 917, 920 (1941); Note, 60 Harv L Rev 793, 794 (1947).

[11] See McCollum v. Board of Education, 333 US 203, 213, 68 S Ct 461, 466, 92 L Ed 649, 659 (1947) (concurring opinion); Everson v. Board of Education, 330 US 1, 67 S Ct 504, 91 L Ed 711, 168 ALR 1392 (1946); Judd v. Board of Education of Union Dist. No. 2, 278 NY 200, 15 NE2d 576, 118 ALR 789 (1938); Carey, A History of the Oregon Constitution (1926); Hudspeth, Separation of Church and State in America, 33 Tex L Rev 1035 (1955); Konvitz, Separation of Church and State: The First Freedom, 14 Law & Contemp Prob 44 (1949); Note, 60 Harv L Rev 793 (1947); Note, 50 Yale L J 917 (1941).

[12] Some of the reasons for this separation, as expressed by the courts and legal writers, are: Everson v. Board of Education,

The general policy is clear. Our problem is to determine whether that policy is violated by the distribution of free textbooks to parochial schools under ORS 337.150. A simple solution would be to declare that Article I, § 5 prohibits the legislature from conferring *any* benefit upon religious institutions including church supported schools, no matter how indirect it might be. But the principle of separation of church and state has not been applied in such strict form. A certain amount of interplay of influences exercised by state and church has been permitted. It is not difficult to cite examples. Thus, we find that provision is made for chaplains in both houses of Congress and in the Armed Forces; for chapel services at West Point and Annapolis; sessions of the legislature are opened with prayer; the Bible is used to administer oaths, and many other religious practices and connotations are found in the functioning of government, both state and federal.[@]

Moreover, the wall of separation has not been re-

supra, 330 US at 11, 67 S Ct at 509, 91 L Ed at 721, "The people * * * reached the conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any or all religions * * *"; Judd v. Board of Education, supra, 278 NY at 209, 15 NE2d at 581, "A policy of that kind [state aid to religion] * * * would open the door for a dangerous and vicious controversy among different religious denominations as to who should get the largest share of school funds"; Fahy, Religion, Education and the Supreme Court, 14 Law & Contemp Prob 73, 90 (1949), "This policy * * * is a recognition of an ancient realization of the distinct functions of a temporal government and of a church concerned with the supernatural;" Note, 50 Yale L J 917, 926, n. 58 (1941), "Acceptance of public funds by Catholic schools would result in state control over the manner in which the funds were used, and the schools would lose much of their present independence."

[@] Fellman, Separation of Church and State in the United States: A Summary View, 1950 Wis L Rev 427, 474 (1950).

garded as a barrier preventing all financial aid to religious institutions. In some instances the aid is direct and substantial.[19] In others the financial aid flows indirectly and incidentally as a result of a tax exemption or other favored treatment,[20] or through an expenditure for a governmental purpose clearly within constitutional limits.[21]

For the most part these cases afford us little assistance in the interpretation of our own constitution. This is so because in some of them the controlling constitutional provision differs from ours or is seen against a different historical background. In many instances it is obvious that constitutional principles have been sacrificed to serve urgent needs of the

[19] Bradfield v. Roberts, 175 US 291 (1899) (appropriation for building a ward on property owned by a Catholic hospital); St. Hedwig's Industrial School for Girls v. Cook County, 289 Ill 432, 124 NE 629 (1919) (state payment to a church owned and operated industrial school); Dunn v. Chicago Industrial School for Girls, 280 Ill 613, 117 NE 735 (1917) (state payment to a church owned and operated industrial school); Millard v. Board of Education, 121 Ill 297, 10 NE 669 (1887) (parochial school supported as a public school); State ex rel Johnson v. Boyd, 217 Ind 348, 28 NE2d 256 (1940) (parochial schools operated as a part of the public school system); Rawlings v. Butler, 290 SW2d 801 (Ky 1956) (parochial school supported as a public school).

[20] 26 USC § 501(c)(2), (3), 501(d) (1958) (exemption from income tax of religious organizations and corporations); 26 USC § 107 (1958) (exclusion from gross income of a rental allowance or home given a minister); 26 USC § 170 (1958) (individual taxpayer's deduction for contribution to religious organizations); St. Patrick's Church Society v. Heermans, 68 Misc 487, 124 NYS 705 (1910) (free water furnished to a parochial school under a lease to a private company of city owned waterworks); Gubler v. Utah State Teachers' Retirement Bd., 113 Utah 188, 192 P2d 580, 2 ALR2d 1022 (1948) (teachers' retirement act allowed credit for time spent teaching in parochial schools). See Paulsen, Preferment of Religious Institutions in Tax and Labor Legislation, 14 Law & Contemp Prob 144 (1949); Note, 3 Rutgers L Rev 115 (1949).

[21] See, Bowker v. Baker, 73 Cal App2d 653, 666, 167 P2d 256, 262 (1946).

community and state;[38] and in others there simply has not been any real analysis of the problem.[39] Some of these cases are strongly relied upon by defendants. We do not propose to appraise each of the numerous cases which have attempted to draw the line of distinction between expenditures which are within and expenditures which are outside constitutional limits.[40] The reasoning employed in these cases will be examined as we consider defendants' argument.

Defendants' principal argument in support of the statute is that the expenditure of public funds for the purpose of furnishing books to pupils of parochial and public schools benefits the pupils who receive these books and not the schools themselves. The leading case for this proposition is *Borden v. Louisiana State Board of Education,* 168 La 1005, 123 So 655, 67 ALR 1183 (1929). In that case a statute similar to ORS 337.150 was attacked on constitutional grounds essentially the same as those asserted in the case at bar. The Louisiana court, with three Justices dissenting, sustained the statute on the ground, among others,

[38] St. Hedwig's Industrial School for Girls v. Cook County, 289 Ill 432, 124 NE 629 (1919); Dunn v. Chicago Industrial School for Girls, 280 Ill 613, 117 NE 735 (1917); Rawlings v. Butler, 290 SW2d 801 (Ky 1956).

[39] Cochran v. Board of Education, 281 US 370, 50 S Ct 335, 74 L Ed 913 (1930); Bradfield v. Roberts, 175 US 291 (1899); Millard v. Board of Education, 121 Ill 297, 10 NE 669 (1887); Borden v. Louisiana State Board of Education, 168 La 1005, 123 So 655, 67 ALR 1183 (1929); St. Patrick's Church Society v. Heermans, 68 Misc 487, 124 NYS 705 (1910); Gubler v. Utah State Teacher's Retirement Bd., 113 Utah 188, 192 P2d 580, 2 ALR2d 1022 (1948).

[40] For a treatment of some of these cases see Cushman, Public Support of Religious Education in American Constitutional Law, 45 Ill L Rev 333 (1950); Fellman, Separation of Church and State in the United States; A Summary View, 1950 Wis L Rev 427 (1950); Sullivan, Religious Education in the Schools, 14 Law & Contemp Prob 92 (1949); Note, 60 Harv L Rev 793 (1947); Note, 3 Rutgers L Rev 115 (1949); Note, 50 Yale L J 917 (1941).

that the expenditure was for the benefit of pupils and not in aid of schools.[21]

This so-called "child benefit theory" has been applied in other cases in which the expenditure of public funds is made for the purpose of meeting the educational needs of pupils, including those attending parochial schools.[22] The difficulty with this theory is, however, that unless it is qualified in some way it can be used to justify the expenditure of public funds for every educational purpose, because all educational aids are of benefit to the pupil. This criticism is made in *Gurney v. Ferguson,* 190 Okla 254, 255, 122 P2d 1002, 1003-1004 (1942). In passing upon expenditures for the transportation of children attending parochial schools the court said:

"* * * It is true this use of public money and property aids the child, but it is no less true that practically every proper expenditure for school purposes aids the child. We are convinced that this expenditure, in its broad and true sense, and as commonly understood, is an expenditure in further-

[21] The Borden case was followed in Cochran v. Louisiana State Board of Education, 168 La 1030, 123 So 664 (1929). The latter case was appealed to the United States Supreme Court (281 US 370). The only question on that appeal was whether the act authorized the taking of private property for a private purpose in violation of the Fourteenth Amendment. The applicability of the First Amendment was not considered.

[22] Bowker v. Baker, 73 Cal App2d 653, 167 P2d 256 (1946) (transportation furnished to students of parochial schools); Borden v. Louisiana State Board of Education, 168 La 1005, 123 So 655, 67 ALR 1183 (1929) (textbooks furnished parochial school students); Adams v. County Commissioners of St. Mary's County, 180 Md 550, 26 A2d 377 (1942) (reimbursement to parochial school for the expense of transporting its students); Board of Education v. Wheat, 174 Md 314, 199 A 628 (1938) (transportation furnished to students of parochial schools); Chance v. Mississippi State Textbook Rating & Purchasing Bd., 190 Miss 453, 200 So 706 (1941) (textbooks furnished parochial school students); Everson v. Board of Education of Ewing Twp., 133 NJL 350, 44 A2d 333 (1945) (transportation furnished to students of parochial schools).

ance of the constitutional duty or function of maintaining schools as organizations or institutions. The state has no authority to maintain a sectarian school. Surely the expenditure of public funds for the erection of school buildings, the purchasing and equipping and the upkeep of same; the payment of teachers, and for other proper related purposes is expenditure made for schools as such. Yet the same argument is equally applicable to those expenditures as to the present one."

And, as observed by the same court, if the expenditure is not in aid of schools the use of school funds would be unauthorized and illegal.[24]

The leading case rejecting the child benefit theory is *Judd v. Board of Education*, 278 NY 200, 15 NE2d 576, 118 ALR 789 (1938). In that case the validity of a statute authorizing the expenditure of public funds for the transportation of pupils to and from parochial and private schools was in question. The court said:

"* * * Free transportation of pupils induces attendance at the school. The purpose of the transportation is to promote the interests of the private school or religious or sectarian institution that controls and directs it. 'It helps build up, strengthen and make successful the schools as organizations' (State ex rel. Traub v. Brown, 36 Del. 181, 187, writ of error dismissed, Feb. 15, 1938). Without pupils there could be no school. It is illogical to say that the furnishing of transportation is not an aid to the institution while the employment of

---

[24] Mitchell v. Consolidated School Dist., 17 Wash2d 61, 67, 135 P2d 79, 81-82, 146 ALR 612 (1943), "We cannot, however, accept the validity of the argument that transportation of pupils to and from school is not beneficial to, and in aid of, the school. Even legislation providing for transportation of pupils to and from public schools is constitutionally defensible only as the exercise of a governmental function furthering the maintenance and development of the common school system."

See also Note, 60 Harv L Rev 793, 797, n. 51 (1947).

teachers and furnishing of books, accommodations and other facilities are such an aid." Id. at 212, 15 NE2d at 582.

The furnishing of textbooks even more clearly constitutes an educational aid. In the Everson case the expenditure for the transportation of parochial school pupils was upheld on the theory that the state could provide for the protection of all school children from traffic hazards irrespective of the religious or public character of schools which they attended. Assuming that the court's reasoning in Everson is sound, it is not applicable to the case at bar. The expenditure of public funds for textbooks supplied to pupils of parochial schools is clearly identified with the educational process, and does not warrant the assumption made in the Everson case that the expenditure is for the general welfare thus justifying the use of the state's police power.

The most recent appraisal of the child benefit theory which has been brought to our attention is *Matthews v. Quinton*, (Alaska) 362 P2d 932 (1961). In that case a statute authorizing the transportation of children attending non-public schools was held to be in violation of the Alaska constitutional provision prohibiting the appropriation of public money for the support or benefit of any sectarian, denominational or private school. After a careful examination of the cases in which the child benefit theory had been considered, the court rejected the theory, holding that the furnishing of transportation to pupils of non-public schools constituted a direct benefit to those schools. Mr. Justice Rutledge's dissent in the Everson case was relied upon to support this conclusion. There it was said:

"Finally, transportation, where it is needed, is

as essential to education as any other element. Its cost is as much a part of the total expense, except at times in amount, as the cost of textbooks, of school lunches, of athletic equipment, of writing and other materials; indeed of all other items composing the total burden. Now as always the core of the educational process is the teacher-pupil relationship. Without this the richest equipment and facilities would go for naught. See Judd v. Board of Education, 278 NY 200, 212, 15 NE2d 576, 582. But the proverbial Mark Hopkins conception no longer suffices for the country's requirements. Without buildings, without equipment, without library, textbooks and other materials, and without transportation to bring teacher and pupil together in such an effective teaching environment, there can be not even the skeleton of what our times require. Hardly can it be maintained that transportation is the least essential of these items, or that it does not in fact aid, encourage, sustain and support, just as they do, the very process which is its purpose to accomplish. No less essential is it, or the payment of its cost, than the very teaching in the classroom or payment of the teacher's sustenance. Many types of equipment, now considered essential, better could be done without." 330 US 1,47-48.[20]

We concur in the view that expenditures which aid a child as a pupil of a religious school cannot in that respect be regarded as serving the public welfare as

[20] In some cases it is admitted that the parochial schools are aided by a particular expenditure but that the aid is so unsubstantial that it does not come within the constitutional prohibition against aid to sectarian institutions. Nichols v. Henry, 301 Ky 434, 444, 191 SW2d 930, 935 (1945) held that the aid was so indirect that it was not "sufficient to defeat the declared purpose and the practical and wholesome effect of the law." And it is pointed out that "many expenditures of public money give indirect and incidental benefit to denominational schools" as for example, sewers, sidewalks, streets, police and fire protection. Bowker v. Baker, 73 Cal App2d 653, 666, 167 P2d 256, 262 (1946).

that term is used in defining the state's police power. The reason is stated by Mr. Justice Rutledge in his dissent in *Everson v. Board of Education,* 330 US 1, 53, 67 S Ct 504, 529, 91 L Ed 711, 742, 168 ALR 1392 (1946): the First Amendment "has removed this form of promoting the public welfare from legislative and judicial competence to make a public function. It is exclusively a private affair".[28] The dissenting opinion in *Borden v. Louisiana State Board of Education,* 168 La 1005, 1030, 123 So 655, 664, 67 ALR 1183 (1929) expresses the same idea: "Nor is there any room here for the application of the state's police power. That power is not absolute and cannot be invoked to sustain legislative acts which in their operation defeat the objects and purposes of the organic law."[29] We are of the opinion that this analysis is correct.

It is argued that the aid to school children is for a public purpose because the compulsory school law compels all children to attend school and that the state may, therefore, make expenditures to further compliance. But this begs the basic question—the state may not compel compliance through the device of furnishing aid to religious schools if that aid is in violation of the constitution.[30] Moreover, the state does not compel pupils to attend *parochial* schools; "their attendance upon the parochial school or private school is a matter of choice and the cost thereof not a matter

[28] "By no declaration that a gift of public money to religious uses will promote the general or individual welfare, or the cause of education generally, can legislative bodies overcome the Amendment's bar." Rutledge, dissenting in Everson v. Board of Education, 330 US at p. 52.

[29] Accord, Mitchell v. Consolidated School Dist., 17 Wash2d 61, 135 P2d 79, 146 ALR 612 (1943).

[30] Judd v. Board of Education, 278 NY 200, 215, 15 NE2d 576, 584, 118 ALR 789 (1938).

of public concern." *Judd v. Board of Education,* supra, 278 NY at 211, 15 NE2d at 582.

The theory has been advanced in some cases that since the parochial schools are performing a task which the state itself must perform through the use of the public schools, the expenditures made are not "aid" but "remuneration" for services rendered and, therefore, not prohibited by the constitutional principle of separation of church and state.[29] The distinction is specious and its application could be urged in the justification of the expenditure of public moneys for all educational needs of parochial schools.

■ In the instant case the evidence establishes that the defendant school district expended approximately $4,000 for textbooks used in the St. John's school. This constitutes a substantial benefit. The benefit is of such a character as to bring it within the proscription of Article I, § 5.

■ It seems obvious that as long as church and state continue to exist side by side there can not be a complete isolation of each, with neither exerting influence upon the other. It is to be expected that in the operation of the state residual benefits will accrue to the various religious groups, not because they are religious

---

[29] St. Hedwig's Industrial School for Girls v. Cook County, 289 Ill 432, 124 NE 629 (1919); Trost v. Ketteler Manual Training School for Boys, 282 Ill 504, 118 NE 743 (1918); Dunn v. Addison Manual Training School for Boys, 281 Ill 352, 117 NE 993 (1917); Dunn v. Chicago Industrial School for Girls, 280 Ill 613, 117 NE 735 (1917); Murrow Indian Orphans Home v. Childers, 197 Okla 249, 171 P2d 600 (1946); State ex rel Atwood v. Johnson, 170 Wis 251, 176 NW 224 (1920). *Contra,* Cook County v. Chicago Industrial School for Girls, 125 Ill 540, 18 NE 183 (1888); Synod of Dakota v. State, 2 S D 366, 50 NW 632 (1891). But cf., State ex rel Orr v. City of New Orleans, 50 La Ann 880, 24 So 666 (1898). See, Cushman, Public Support of Religious Education in American Constitutional Law, 45 Ill L Rev 333 (1950).

organizations but because they are, like other organizations, a part of the community which the state will, and must, serve indiscriminately. As Mr. Justice Black observed in the Everson case, the First Amendment (and its counterpart in state constitutions) "requires the state to be neutral in its relation with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them." (330 US 1, 18).

■ Neither the federal nor the state constitutions prohibit the state from conferring benefits upon religious institutions where that benefit does not accrue to the institution as a religious organization. The proscription is against aid to religious *functions*. The benefits of police and fire protection, sewage disposal, and other community financed services accrue to churches not as religious organizations but as owners of property in the community.[29] And, the same principle applies when public expenditures benefit individuals who are engaged in carrying out a religious function. A government pension paid to a clergyman for his services in the Armed Forces may benefit religion but it is not constitutionally prohibited; in such case he receives the bounty not as a cleric but as any other citizen. On the other hand, the state obviously could not pay the clergyman's salary. The point is clearly seen by Cushman, Public Support of Religious Educa-

---

[29] Bowker v. Baker, 73 Cal App2d 653, 666, 167 P2d 256 (1946) erroneously concludes that because "many expenditures of public money give indirect and incidental benefit to denominational schools" as for example, expenditures for sewers, sidewalks, streets and roads, expenditures for the transportation of pupils to parochial schools is also authorized. Since the expenditures in the two types of cases relate to two different functions of the parochial school the court's conclusion is not logically sound.

tion in American Constitutional Law, 45 Ill L Rev 333, 348 (1950):

> "The difference between providing police protection and providing teachers does not lie in the identity of the beneficiary but in the way in which the aid is extended. Aid is not normally extended to individuals or institutions by name, but rather to groups or classes of individuals or institutions. Any individual or institution falling under the restrictions of the law, or falling heir to its benefits, does so only as a member of such a group. An individual may be a pupil, a pedestrian, a property owner and a parent. A church is at once a corporation, a piece of property, a building, a meeting place, a religious institution and a non-profit institution. Furthermore, a church may receive police protection when classed as property, tax exemption when classed as a non-profit institution, sewage connections when classed as a building, and yet be denied financial aid when classed as a religious institution, since such a class may not validly be given public aid. Since the aid goes to groups rather than the individual components of any one group, the eligibility of an institution to receive public aid would seem to depend on which group it is classed in, rather than on its individual characteristics."[90]

The author then correctly concludes that where the aid is to pupils and schools the benefit is identified with the function of education and if the educational institution is religious, the benefit accrues to religious institutions in their function as religious institutions. And so it is in the case at bar. Granting that pupils and not schools are intended to be the beneficiaries of the state's bounty, the aid is extended to the pupil only as a member of the school which he attends. Whoever else may share in its benefits such aid is an

---

[90] See also, Mr. Justice Jackson's dissent in the Everson case, *supra* at 25, 67 S Ct at 516, 91 L Ed at 728.

asset to the schools themselves. *State ex rel Traub v. Brown*, 36 Del 181, 172 A 835 (1934). The St. John's school shares in this benefit in a direct and vital way.[39] We attach no significance to the fact that the books are loaned to the pupil or school rather than given outright; in either event a substantial benefit is conferred upon the recipient.[40]

We recognize that whether an expenditure is an aid to a religious institution in its religious function or in some other capacity is a question of degree. But it seems clear that the line must be drawn to include within the constitutional proscription the furnishing of textbooks to pupils of parochial schools. This conclusion is compelled because such books are an integral part of the educational process. As we have already pointed out, the teaching of the precepts of Catholicism is an inseparable part of the educational process in the St. John's school. Considering the purpose of Article I, § 5, we are unable to see any substantial distinction between the furnishing of textbooks and the furnishing of blackboards, desks, laboratory instruments, or other equipment clearly necessary to the operation of the school. In comparing these various essential tools we agree with the dissenting opinion in *Everson v. Board of Education of Ewing Twp.*, 133 NJL 350, 359, 44 A2d 33 (1945) that there is no way of "satisfactorily distinguishing one item of expense from another in the long process of child education."

It is argued that the strict notions of separation

---

[39] We do not regard as significant the fact that our constitution does not contain the phrase "directly or indirectly" as some constitutions do. But cf., Judd v. Board of Education, *supra*. See, Note, 60 Harv L Rev 793, 795 (1947).

[40] See Borden v. Louisiana State Board of Education; 168 La 1005, 123 So 655, 67 ALR 1183 (1929) (dissenting opinion).

in vogue at the time of the adoption of our constitutional provisions no longer exist and that these provisions should be interpreted to reflect this change in attitude.[38] Conceding that such change has occurred, there are still important considerations warranting the resolve that the wall of separation between church and state "must be kept high and impregnable." *Everson v. Board of Education,* supra, at p. 18. Among other things, the extension of aid to religious educational institutions could, as observed in *Judd v. Board of Education,* supra at 209, 15 NE2d at 581, "open the door for a dangerous and vicious controversy among the different religious denominations as to who should get the largest share of school funds."[39] More important, perhaps, is the danger that the acceptance of state aid might result in state control over religious instruction. Some religious leaders, including leaders in the Catholic church, have opposed the acceptance of public funds on this ground.[40] These considerations convince us that the wall of separation in this state must also be kept "high and impregnable" to meet the demands of Article I, § 5.

We are not unmindful of the fact that parents who send their children to Catholic schools must bear the double burden of supporting not only their own parochial schools but the public schools as well. But

[38] Sullivan, Religious Education in the Schools, 14 Law & Contemp Prob 92, 107 (1949); Note, 36 Geo L J 631 (1948). But cf., Murray, Law or Prepossessions, 14 Law & Contemp Prob 23, 24-26 (1949).

[39] Everson v. Board of Education, 330 US 1, 59, 67 S Ct 504, 91 L Ed 711, 168 ALR 1392 (1946) (dissenting opinion); Williams v. Board of Trustees, 173 Ky 708, 191 SW 507, 514 (1917); Fellman, Separation of Church and State in the United States; A Summary View, 1950 Wis L Rev 427, 444-45; Note, 47 Colum L Rev 1346, 1355 (1947); Note, 60 Harv L Rev 793, 794 (1947).

[40] 13 Cath Encyc 560 (1912); Note, 50 Yale L J 917, 926 n. 56 (1941).

the added burden is self-imposed; instruction in the public schools is available to all. Catholic schools operate only because Catholic parents feel that the precepts of their faith should be integrated into the teaching of secular subjects. Those who do not share in this faith need not share in the cost of nurturing it. Article I, § 5 so ordains.

■ Defendants argue that the denial of the use of free textbooks to pupils solely because they attend parochial schools would constitute a violation of the equal protection clause of the Fourteenth Amendment. The argument is without merit. The classification which excludes such pupils from the state's bounty is not only reasonable, it is commanded by the constitution itself.

The principle announced in *Pierce v. Society of Sisters*, 268 US 510, 45 S Ct 571, 69 L Ed 1070 (1925), relied upon by defendants, is not germane to the problem before us. That case simply recognizes the constitutional right of a parent to pursue freely his religious beliefs by sending his children to parochial schools. The court did not hold, nor was anything said in the case from which it could be implied, that the state must pay for the child's education if the parent elects to use the parochial schools.

The trial judge was of the opinion that the expenditures in question constituted a violation of the constitutional principle of separation of church and state, but he concluded that he was bound by *Everson v. Board of Education*, 330 US 1, 67 S Ct 504, 91 L Ed 711, 168 ALR 1392 (1946). A decision of the Supreme Court of the United States holding that certain legislation is not in violation of the federal constitution is not an adjudication of the constitutionality of the legislation under a state constitution. In such a case

it is not only within the power of the state courts, it is their duty to decide whether the state constitution has been violated. Our views on the policy or interpretation of a particular constitutional provision do not always coincide with those of the Supreme Court of the United States. As we have indicated, *Everson v. Board of Education,* supra, is distinguishable from the case at bar. Even if it were not, our conclusion would be the same.

The judgment is reversed. The trial court is directed to enter a decree in accordance with the prayer in plaintiffs' complaint.

ROSSMAN, J.

I dissent.

*Everson v. Board of Education,* 330 US 1, 67 S Ct 504, 91 L Ed 711, 168 ALR 1392, spent unusual effort upon a case which was governed by the same principle of law that governs the case at bar. It stated the principle with clarity and sustained the constitutionality of the challenged statute. We should apply the same principle of law in this case and recognize as valid the statute under attack. Certainty of law governing the relationship between the state and religious organizations, although difficult of expression, is peculiarly desirable. Confusion and controversy are certain to arise when the United States Supreme Court and this court interpret differently a constitutional principle that should have a single meaning. The Everson decision affords a good opportunity to achieve a high degree of certainty. It should not be cast aside; it should be embraced.

I will now state an additional reason for my dissent. It is commonly recognized that if more than one reasonable interpretation can be placed upon a statute

which is challenged as invalid, one of which will sustain its constitutionality and the other of which will render it unconstitutional, the courts must accept the former. The most recent of our decisions which so held is *Federal Cartridge Corporation v. Helstrom*, 202 Or 559, 276 P2d 720. I believe that a simple reasonable interpretation can be placed upon ORS 337.150 (the act under attack) which will assure its validity.

A free textbook statute, applicable only to public elementary schools, was enacted in 1931. Oregon Laws 1931, Chapter 61, § 1, p. 74. Oregon Laws 1941, Chapter 485, § 1, page 878, amended the act just cited by expanding its scope. The amended act read:

> "The board of directors of each and every school district in the state of Oregon hereby is authorized, empowered and directed, in the manner hereinafter provided, to provide textbooks, prescribed or authorized by law for the free use of all pupils residing in its respective districts and enrolled in and actually attending standard elementary schools. For the purpose of this act a school shall be standard when it meets the standards of the state board of education and all teachers engaged in classroom instruction in said school shall hold a valid Oregon teaching certificate of the proper teacher level. * * *"

It is clearly evident that the legislature, in making the amendment to the 1931 enactment, wished to improve the quality of the denominational schools. It, therefore, rendered textbooks available also to pupils who were enrolled in denominational schools that met qualifications for "standard elementary schools." But prior to the 1941 act a denominational school could select any textbook it preferred and use it in the classroom. Let us at this point assume that the members of the 1941 Legislative Assembly, in voting to extend

the free use of textbooks to the pupils in denominational schools, thought that the pupils in those schools would receive superior instruction if the schools adopted the books chosen by the State Board of Textbook Commissioners (ORS 337.010 and 337.050); under those circumstances we surely would be forced to hold that the legislature had in mind the pupils and superior instruction for them—not financial gain for the schools. ORS 337.260 is a clear indication that the legislature is vitally concerned with the contents of the textbooks that are used in teaching the youth of Oregon. We see from the facts just mentioned that when a denominational school requests the local school board to render available to its pupils the use of free textbooks it must accept books chosen by the officials of the public school district and not by itself.

The majority concede that although churches and denominational schools pay no taxes they nevertheless receive many benefits from public moneys. For example, if a fire breaks out in a church the local fire department undertakes to extinguish it. That obviously is done because the church is a local asset and also because the fire, if left unextinguished, might spread to other structures. If a thief invades a church or denominational school he is prosecuted by the public authorities because if he were left to go his way the property of others might be taken. However, in all instances of that kind the benefits to the religious organization is secondary or incidental. For example, the street adjacent to a church or denominational institution may be improved at public expense, not for the purpose of conferring a benefit upon the church, but in order to enable traffic to move expeditiously. A church or a denominational school likewise may be

enabled to hook up to the public sewer lines, not in order to confer a benefit upon the church, but because to do otherwise might cause an epidemic of disease to arise. The majority quote from a text writer as follows:

"* * * Furthermore, a church may receive police protection when classed as property, tax exemption when classed as a non-profit institution, sewage connections when classed as a building, and yet be denied financial aid when classed as a religious institution * * *."

Classifications of that kind solve nothing. They represent wishful thinking whereby cases are solved according to preconceived ideas. To me, it seems we must in all instances endeavor to determine why the statute under attack was enacted. A good instance is ORS 421.035 which reads as follows:

"There shall be appointed by the board two chaplains of the Oregon State Penitentiary, two chaplains of the Oregon State Correctional Institution and two chaplains of the MacLaren School for Boys. One shall be a non-Catholic clergyman, the other a Catholic clergyman of the archdiocese of Oregon, in each instance. They shall:

"(1) Look after and attend to the spiritual wants of the inmates of the penitentiary, the correctional institution and the MacLaren School for Boys and of all other public institutions in Marion County, when called upon so to do by the inmates, respectively.

"(2) Visit their respective charges for the purpose of giving them religious and moral instructions * * *."

That enactment represents a clear appropriation of public funds for religious purposes. Yet, when the legislature enacted the statute it was not prompted by a desire to improve the finances of any church,

religious denomination or clergyman. It was thinking of the unfortunate individuals who are confined in our penal institutions and was prompted by a hope that if a clergyman, Bible in his hand, called upon them a new light might enter their lives and turn them from law breaking to worthy aspirations. A Salvation Army band, clothed in tattered uniforms but playing some of the church's favorite hymns as it marches through skid row is a greater force for law compliance than a battalion of police officers.

As I have indicated, the act in question clearly can be deemed an educational act. Its purpose was to bring to the avail of the pupils in denominational institutions textbooks which the legislature favored. The legislature was not concerned with any church, but with the youth of Oregon and believed that textbooks chosen by the State Board of Textbook Commissioners would afford superior education to those selected by the denominational schools.

I add that a parochial school is in no sense enriched through the operation of the statute under attack. If, prior to the enactment of ORS 337.150 the parochial school did not provide for its pupils free textbooks then obviously ORS 337.150 did not relieve it of any burden. But, if prior to the enactment of ORS 337.150 the parochial school provided free textbooks, then the act under question does not give to the parochial school any books whatever. ORS 337.200(2) renders it clear that the books are entrusted to the pupil and are not the property of the school. In fact, ORS 337.190 states:

"All textbooks purchased under ORS 337.150 are, and shall remain, the property of the school district. Upon receipt thereof, each of said books shall be immediately and properly labeled as the property of the school district."

ORS 337.200 renders it the duty of the Superintendent of Public Instruction to see to it that all of the books thus rendered available to the pupils are returned to the school board. Without further analysis I express my conclusion that the act under review is constitutional and that this court should adhere to *Everson v. Board of Education,* supra.