Argued and submitted April 19, 1985, affirmed May 21, reconsideration denied
August 8, petition for review allowed November 12, 1986 (302 Or 194)

KAY et al,
*Respondents,*
TAKASHIMA,
*Plaintiff,*

*v.*

DAVID DOUGLAS SCHOOL DISTRICT NO. 40 et al,
*Appellants.*

(A8404-02438; CA A32742)

719 P2d 875

Robert L. Dressler, Portland, argued the cause for appellants. With him on the briefs was Dressler & Granata, Portland. Charles F. Hinkle, Portland, argued the cause and filed the brief for respondents.

W. G. Kelly Clark and Robert LeChevallier, Portland, filed a brief *amicus curiae* for Christian Legal Society.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

Warren, J., concurring.

Rossman, J., dissenting.

### BUTTLER, P. J.

In this action for declaratory and injunctive relief premised on the state and federal constitutions and 42 USC § 1983, defendants appeal from a judgment enjoining them from sponsoring, permitting or encouraging the inclusion of formal prayer in the invocation and benediction at the commencement exercises of the David Douglas High School class of 1984, and awarding attorney fees to plaintiffs.[1] The trial court held that the inclusion of the proposed prayer would violate Article I, sections 2, 3, and 5 of the Oregon Constitution and the First Amendment to the United States Constitution. We hold that the inclusion of the invocation would have violated Article I, sections 2 and 5, of the Oregon Constitution, and affirm.[2]

During the 1983-84 school year, plaintiffs Kay, Strieby, Deibele, and Epstein were seniors at David Douglas, expecting to be graduated with the class of 1984 and desiring to participate in the commencement to be held on May 23,

---

[1] The 1984 commencement took place as scheduled, without a religious invocation or benediction. This appeal is not moot, however, because the award of attorney fees is predicated on plaintiffs' entitlement to an injunction. Additionally, we retain jurisdiction, because the problem here is one "capable of repetition, yet evading review." *OSAA v. Stout,* 71 Or App 405, 692 P2d 633 (1984)..

[2] The parties are in agreement that the proposed invocation is a religious prayer:

"Let us pray:

"Our God the sustainer of our lives, we ask your presence here with us tonight and give you thanks for the possibilities you open to us for fuller, richer lives. As we honor these graduates who are ending one phase of their education, we are grateful for their accomplishments and for the families, teachers, friends who have helped them arrive at this point. We ask for your continued care and guidance as they go forth to new experiences. Enable these young people to face the future with courage and determination to find ways to create a better world for us all. Expand their visions; help them to follow their dreams and to live satisfying lives in the world of peace.

"Bless each of us as we celebrate this night and keep us ever mindful of your goodness to us.

"Amen."

They do not appear to argue over the content of the proposed benediction:

"I want to speak well of education. The real test of education is how we live as individuals and as groups. If we cherish hatred and antagonism, our education has failed. When is a man educated? When he knows how to live, how to love, how to hope. Of all the forces that make for a better world, none is so indispensable, none so powerful, as hope. Without hope men are only half alive. With hope men dream and think and work. Graduates, help make a better world."

1984, at the Portland Civic Auditorium. Plaintiff Disselbrett is the mother of plaintiff Epstein and a taxpayer in the David Douglas school district.

Defendant Utz, principal of the high school since 1973, testified that, to his knowledge, the school always has had a prayer-like invocation at its commencement. He said that the purpose of the commencement ceremony is to honor seniors and not to promote religion. Defendant Reese, chairman of the David Douglas School District School Board, agreed with Utz that the purpose of the commencement is ceremonial rather than religious. He stated that the decision was made to include the religious invocation, because it is a traditional part of the ceremony and because a majority of those taxpayers who had spoken to him had expressed the desire to maintain that tradition. One hundred seventy-eight seniors signed a petition in support of the "traditional" ceremony.

The school district rented the Portland Civic Auditorium for the commencement at a rental of $1,450. The ceremony was planned by school personnel, on school time. The proposed program began with a processional march to "Pomp and Circumstance," followed by the flag salute and the invocation. Utz testified that the program was planned with the view of creating an atmosphere of dignity and solemnity and that the invocation is included for that purpose. He agreed that that objective could be accomplished by many other means that would not involve a religious invocation, such as an appropriate reading from Shakespeare, Tennyson or other writers.

In years past, members of the clergy had been invited to give the invocation; recently, however, the board had selected retired school teachers who were particularly close to students, or senior teachers. The invocation for 1984 was written by Mrs. Fredrickson, a counselor and teacher of advanced English, who was to deliver it. There is evidence that she was not restricted as to its content,[3] and the one that she prepared is very similar to those that had been used in the past.

---

[3] However, Utz conceded that, if a Roman Catholic mass had been proposed, he would have honored the objection of a single dissenter. Clearly, there was *some* control of content, contrary to the statement of the dissent. 79 Or App at 402.

Attendance at commencement is voluntary. Students need not be present to receive their diplomas or awards. However, it is a ceremony in which every student is entitled to participate fully, regardless of his or her religious faith or absence of religious faith. Some of the highest awards that a member of the senior class can receive are announced at the commencement.

Kay, valedictorian of his class, attended a school board meeting on April 19, 1984, at which he and two other students urged the board not to include a vocal prayer, but to include instead a moment of silence or an appropriate reading from literature. He suggested that those who wished a religious ceremony could hold a separate baccalaureate at an area church. The board rejected that proposal and adopted a resolution directing the superintendent and principal to "include an invocation, benediction and choral music appropriate to the occasion." It is agreed that the invocation written by Fredrickson was the invocation to be read at the ceremony, that it is a prayer and that its reading would be a religious activity.

■ This case was argued under the Oregon and federal constitutions. We consider the Oregon constitutional questions first. *State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983). Plaintiffs contend that the inclusion of the religious invocation would have violated Article I, section 5, of the Oregon Constitution:

"No money shall be drawn from the treasury for the benefit of any religeous [*sic*] or theological institution, nor shall any money be appropriated for the payment of any religeous [*sic*] services in either house of the Legislative Assembly."

Defendants contend that no money was actually spent on the invocation, because the teacher who prepared and was scheduled to read it volunteered her time. The school district paid $1,450 from public funds to the city of Portland for use of the auditorium, and faculty time was devoted to the planning of the ceremony. The fact that money spent on the preparation and delivery of the invocation was not apportioned and identified as a "line item" in the budget does not take it out of the proscription of section 5, which prohibits the spending of *any money* for the benefit of any religious or theological

institution. We need not decide whether the minimal expenditure of public funds, by itself, would have violated section 5, *see Dickman et al v. School Dist. 62C et al,* 232 Or 238, 366 P2d 533 (1961), *cert den* 371 US 823 (1962), because we believe that the broader concept encompassed within that section of maintaining the wall of separation between church and state and of proscribing the establishment of religion would have been violated. We note, however, that section 5 expressly prohibits the appropriation of *any* money "for the payment of any religeous [*sic*] services in either house of the Legislative Assembly."

The Supreme Court has interpreted section 5 as far more than a mere prohibition of direct government financial support of a specific church-related institution. In *Lowe v. City of Eugene,* 254 Or 518, 451 P2d 117, 459 P2d 222, 463 P2d 360 (1969), *cert den* 397 US 1042 (1970), the court held that the prohibition of section 5 applied to the city's permitting the maintenance of a Latin cross in a public park, even though no money had been spent by the city. The court reasoned that the display of the cross permitted "an inference of official endorsement of the general religious beliefs which underlie that symbol." 254 Or at 544. It further stated, citing United States Supreme Court cases, that "the government has no business placing its power, prestige, or property at the disposal of private persons or groups either to aid or oppose any religion." 254 Or at 545.

Although the Oregon Constitution contains no specific "credal preference" or "establishment" clause, the court reasoned that "it is obvious that the founders of this state did not intend to permit the state to sponsor any particular religion." 254 Or at 547. For that reason, the court stated, Article I, section 5, was included in the Oregon Constitution. In holding that permitting the placing of a cross in a public place violated that provision, the court stated:

> "It is not the emblem of a religious belief which is objectionable under the state and federal constitutions; it is the enlistment of the hand of government to erect the religious emblem which offends the constitutions." 254 Or at 548.

Both *Lowe* and *Dickman* illustrate that Article I, section 5, has been regarded as Oregon's Establishment Clause and has been

treated as expressing the state's commitment to a separation of church and state.

Some years later, in considering the same cross in the same park under different facts, the Supreme Court once again addressed the application of the Oregon Constitution to the separation of church and state, particularly Article I, section 5. *Eugene Sand & Gravel v. City of Eugene,* 276 Or 1007, 558 P2d 338 (1976).[4] In determining the constitutionality of the city's conduct, the court adopted the three-part test established by the United States Supreme Court in *Lemon v. Kurtzman,* 403 US 602, 91 S Ct 2105, 29 L Ed 2d 745 (1971), for determining violations of the Establishment Clause of the First Amendment to the United States Constitution. The Court stated that religious activity engaged in by the government will violate the Oregon Constitution, unless (1) the conduct reflects a clearly secular purpose; (2) it has a primary effect (as distinguished from an "incidental" effect) that neither advances nor inhibits religion; *and* (3) it avoids excessive government entanglement with religion. Although the United States Supreme Court has departed from the three-part test in one "unique" case, *Marsh v. Chambers,* 463 US 783, 103 S Ct 3330, 77 L Ed 2d 1019 (1983), it has since reiterated its adherence to the test in a school prayer case. *Wallace v. Jaffree,* 472 US ___, 105 S Ct 2479, 86 L Ed 2d 29 (1985). We conclude that it is applicable here in assessing the school district's conduct under the Oregon Constitution.[5]

The test should be viewed and applied within the broader framework of law that has developed around the Establishment Clause of the First Amendment. In *Walz v. Tax Commissioner,* 397 US 664, 668, 90 S Ct 1409, 25 L Ed 2d 697 (1970), the Court stated that the clause affords protection

---

[4] The cross had not been removed. Subsequent to the court's decision in *Lowe v. City of Eugene, supra,* a complaint was filed alleging that circumstances had changed materially, in that the voters of the city had approved an amendment to the city's charter accepting the cross as a gift and dedicating it as a memorial or monument to United States war veterans. The court, in *Eugene Sand & Gravel v. City of Eugene, supra,* considered the constitutionality of the display of the cross under those "changed circumstances" as if it were a different case from that presented in *Lowe.* It held that there was no constitutional violation, because the purpose of the display had become strictly secular, any effect to advance or inhibit religion was remote or incidental and there was no excessive entanglement by the city.

[5] A later change in federal interpretation would not have affected Oregon's interpretation of its constitution. *State v. Caraher,* 293 Or 741, 653 P2d 942 (1982).

against sponsorship, financial support and active involvement of the sovereign in religious activity. A frequently quoted summary of the proscriptions is contained in the concurring opinion of *Abington School Dist. v. Schempp,* 374 US 203, 83 S Ct 1560, 10 L Ed 2d 844 (1963):

> "* * * What the Framers meant to foreclose, and what our decisions under the Establishment Clause have forbidden, are those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice. * * *" 374 US at 294.

■  The courts have acknowledged and wrestled with the fact that religion is, and historically has been, a strong element of American life. As defendants contend, not all governmental references to a god are prohibited. *See Lynch v. Donnelly,* 465 US 668, 104 S Ct 1355, 79 L Ed 2d 604 (1984). History and tradition weigh heavily in a consideration of the extent to which government acknowledgment of religion may be incorporated in public ceremonies. In one case, *Marsh v. Chambers, supra,* the United States Supreme Court employed an exclusively historical analysis in considering the constitutionality of a religious invocation at the opening of the Nebraska legislature. Article I, section 5, appears to sanction that practice in the Oregon legislature, so long as no funds are appropriated for it. Certain practices involving references to a god or having a religious origin have acquired over time non-religious significance and have become a part of our national heritage and have taken on patriotic significance, such as the phrase "In God We Trust" that appears on coins. Also, the government has, from time to time, accommodated the religious practices of individuals, such as by the creation of a national holiday on December 25. Such an accommodation must, however, be distinguished from sponsorship or the conveyance of a message of government endorsement or approval of religion.

■  Here, witnesses for the school board testified that the religious invocation was chosen in order to adhere to school tradition and to create an atmosphere of dignity and solemnity. They insist that the decision to include the prayer was not motivated by the desire to promote any particular religion

or religion in general. There is also evidence, however, that the decision to include the prayer was motivated primarily by a desire to satisfy the wishes of a majority of the students and taxpayers, who, in turn, desired a religious invocation. If this was, in fact, the motivation, it is subject to the same attack on constitutional grounds as a decision made on purely religious grounds. *See Lowe v. City of Eugene, supra,* 254 Or at 546. The school board's decision to include a prayer instead of a non-religious reading that could have accomplished the alleged secular objectives is also an indication that the purpose for including the prayer was religious, not secular. *Abington School Dist. v. Schempp, supra,* 374 US at 294. In any event, no matter what the subjective intent of the school board, prayer by its nature is religious; accordingly, the purpose for which a prayer is given necessarily must be religious. It would be a contradiction in terms to say that the giving of a prayer has no religious purpose.

We also believe that the effect of the prayer here was to create the impression that government was sponsoring or endorsing religion. For many students and parents, commencement is the most significant high school experience. It is long anticipated and involves much planning. Awards and special honors are presented and a great effort is made to create a memorable occasion. As defendants have emphasized, the invocation is a part of the ceremony; it sets the tone for the entire occasion. More than creating an atmosphere of dignity and solemnity, the inclusion of a religious invocation at the beginning of the ceremony would have created, from an objective standpoint, the impression that the school district assigned special significance to prayer. The fact that the invocation was to be read by a senior teacher could have intensified that impression. The school district's affirmative decision directing that a prayer, rather than some other appropriate non-religious statement or reading, be included in this important school event conveyed the message that it had given its endorsement to prayer and to religion. The inclusion of the prayer would have crossed the line from the accommodation of religion to an impermissible appearance of sponsorship. It matters not that attendance at the ceremony is voluntary, as defendants emphasize. Such a defense is not relevant to a challenge under the Establishment Clause. *Engel v. Vitale,* 370 US 421, 430, 82 S Ct 1261, 8 L Ed 2d 601 (1962).

The school board's action in directing the superintendent and principal of David Douglas High School to include the religious invocation required plaintiffs, including the class valedictorian, as well as other students, to choose between attending the ceremony or staying away. That action was in violation of Article I, section 5, of the Oregon Constitution.[6]

The *amicus* brief contends that the rights of students who wished to express their faith through prayer are protected by the First Amendment to the United States Constitution. The Oregon Constitution contains a similar provision. Or Const, Art I, § 8. There is no doubt that one has the right to worship as one sees fit. However, we know of no authority that permits one, or even a majority, to require that a commencement exercise be opened with a vocal, public prayer. The argument does point out an important aspect of the problem: whether, how and when to pray is not, and should not be, a political question determined by majority vote. As the court said in *Lowe v. City of Eugene, supra:*

> "Religious freedom and majority rule must live side by side. The majority, no matter how pure its intentions, has no right under our system of government to exert its political muscle to gain a preferred place for its testimony to its religious beliefs." 254 Or at 546.

In any event, in this case no students have asserted that their rights were so violated, so the question is not presented.

■        Defendants assign error to the trial court's award of attorney fees to plaintiffs, arguing first that an award of attorney fees is not proper, because the trial court did not properly reach the federal question on which the award of

---

[6] It also violated Article I, section 2:

"All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences."

Clearly, "the natural right to worship Almighty God," protected by Article I, section 2, includes the right not to worship. As Lafayette Grover, the chairman of the committee on the bill of rights at Oregon's Constitutional Convention in 1857, stated:

"It is true that this constitution goes a step farther than other constitutions on this subject; but if that step is in the right direction, and consistent with the proper development of our institutions, I see no weight in the objection that it is new. Let us take the step farther, and declare a complete divorce of church and state." Carey, *The Oregon Constitution* 302 (1926).

attorney fees is based. (42 USC § 1983; 42 USC § 1988[7]). The trial court held for plaintiffs on both state and federal grounds. Whether the court was required to address Oregon law first does not alter the fact that plaintiffs prevailed on their federal claim. However, even if they had not so prevailed, they would not have been precluded from an award of attorney fees under section 1988. Plaintiffs have prevailed on a constitutional claim that was factually identical to their federal civil rights claim, justifying an award of attorney fees under section 1988, which applies in state as well as federal courts. *Maine v. Thiboutot,* 448 US 1, 100 S Ct 2502, 65 L Ed 555 (1980); *Filipino Accountants' Ass'n v. State Bd. of Accountancy,* 155 Cal App 3d 1023, 204 Cal Rptr 913 (1984); *see Maher v. Gagne,* 448 US 122, 132 n 15, 100 S Ct 2570, 65 L Ed 2d 653 (1980).

■     Defendants argue that, before plaintiffs are entitled to recover attorney fees under section 1988, there must have been a violation of rights. Here, it is argued, there has been no violation, because defendants complied with the court's order enjoining them from including the prayer in the ceremony. Defendants overlook the fact that the purpose of this action was to prevent a violation of the rights that plaintiffs asserted, and that, but for the injunction issued in this action, there would have been a violation of those rights. Section 1988 provides for attorney fees to the prevailing party in *any action* brought under section 1983, and that includes an action to enjoin proposed unconstitutional state action. *Fitzharris v. Wolff,* 702 F2d 836 (9th Cir 1983). We need not decide whether the state may be compelled to award attorney fees; it is enough that the federal statute authorizes them here, even though

---

[7] Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Section 1988 provides:

"In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, * * * the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

there is no state statute authorizing them. We cannot say that the trial court abused its discretion in awarding plaintiffs attorney fees.

Finally, defendants assert that plaintiffs have failed to plead a basis for the award of attorney fees as required by ORCP 68(C)(2):

"A party seeking attorney fees shall assert the right to recover such fees by alleging the facts, statute, or rule which provides a basis for the award of such fees in a pleading filed by that party. * * *"

In their complaint, plaintiffs alleged violations of section 1983, and then alleged that they were entitled to attorney fees; they pled no specific statutory basis or legal theory that would support the award.

■    Although plaintiffs might not have been entitled to attorney fees if this action had been brought only under state law, the right to attorney fees under section 1988, although a "part of the costs," is regarded by the United States Supreme Court as "an integral part of the remedies necessary to obtain" compliance with section 1983. *Maine v. Thiboutot, supra,* 448 US at 11. The right to attorney fees need not be alleged in the pleadings in an action brought in federal court. *White v. New Hampshire Dept. of Empl. Sec.,* 445 US 445, 102 S Ct 1162, 71 L Ed 2d 325 (1982).

■ ■    When federal claims are brought in a state court, state procedures ordinarily control. *Brown v. Western R. of Alabama,* 338 US 294, 296, 70 S Ct 105, 94 L Ed 2d (1949). Here, however, we are not prepared to say that the right to attorney fees under section 1988 is strictly a matter of procedure. *See Long v. Storms,* 52 Or App 685, 629 P2d 827 (1981). The United States Supreme Court has made the provisions of section 1988 applicable in state courts. *Maine v. Thiboutot, supra.* ORCP 68, if applied to the federal claim for attorney fees, would do more than implement state procedure; it would impose a pleading requirement for the recovery of attorney fees that is not present in the federal law. In *Brown v. Western of Alabama, supra,* 338 US at 298, the Court stated that "[s]trict local rules of pleading cannot be used to impose unnecessary burdens upon rights of recovery authorized by federal laws" and that uniformity of adjudication of federally created rights could not be achieved "[s]hould this court fail to

protect federally created rights from dismissal because of overexacting local requirements for meticulous pleadings." Here, plaintiffs clearly alleged claims under section 1983, among others, and also alleged entitlement to attorney fees, an integral part of their remedy. Defendants were not prejudiced.

Affirmed.

**WARREN, J.,** concurring.

Although the dissent makes the point that other examples of governmental nonneutrality toward religion are common, those examples prove nothing relevant to the constitutional challenge made here. It is no answer in this case that attendance at the commencement is voluntary, and it is no answer that there may be other inconsistencies between what government does and what it should do. As the lead opinion points out, certain originally religious references have acquired, over time, nonreligious significance. The prayer proposed to be offered at the commencement in this case does not fall within that category.

The greatness of this democracy is due in no small measure to the fact that we adhere to the principle that, although the majority rules, the rights of minorities are fiercely respected. No student or parent entitled to attend a commencement ceremony or any other governmentally sponsored event should feel a need to remain away or compromise principles because he or she holds beliefs at variance with those of the majority of American citizens.

I join in Judge Buttler's opinion.

**ROSSMAN, J.,** dissenting.

Although I agree with the majority that the appropriate analysis for determining violations of Oregon's "Establishment Clause," Or Const, Art I, § 5, is the three-part test established by the United States Supreme Court in *Lemon v. Kurtzman,* 403 US 602, 91 S Ct 2105, 29 L Ed 2d 745 (1971), I do not agree that, on the facts before us, there is a violation in this case. Therefore, I must respectfully dissent.

In *Eugene Sand & Gravel v. City of Eugene,* 276 Or 1007, 558 P2d 338 (1976), *cert den* 434 US 876 (1977), the Oregon Supreme Court adopted the *Lemon* three-part test for

analysis of questions under Article I, sections 2, 3 and 5, of the Oregon Constitution. In order to be constitutionally valid, governmental action must

(1) reflect a clearly secular purpose;

(2) have a primary effect (as distinguished from an incidental effect) that neither advances nor inhibits religion; and

(3) avoid excessive government entanglement with religion. 276 Or at 1012-13.

When applying this test, it is important to note that the Oregon Supreme Court recognizes that drawing the line between government neutrality toward religion and government support of religion is a matter of degree. The analysis in these cases must retain some manner of flexibility. Oregon has adopted the philosophy that

" '* * * Devotion to the great principle of religious liberty should not lead us into a rigid interpretation of the constitutional guarantee that conflicts with the accepted habits of our people.' " *Eugene Sand & Gravel v. City of Eugene, supra,* 276 Or at 1014, (quoting *McCollum v. Board of Education,* 333 US 203, 256, 67 S Ct 461, 92 L Ed 649 (1948) (Reed, J., dissenting)).

With these basic principles in mind, I now turn to an application of the test to the facts before us.

### (1) *Secular Purpose*

To meet the first prong of the *Lemon* test, governmental conduct must have a "clearly secular purpose." The majority disposes of this issue by saying that prayer is "inherently religious" and that, therefore, in this case the purpose for which the invocation is used must necessarily be religious. This terse analysis fails, because it erroneously restricts itself to consideration of the *nature* of the conduct involved.[1] Even if prayer is, by its nature, religious, that is not the end of the

---

[1] In this case, defendants concede that the invocation is a prayer and that it is a religious activity. In the absence of such a concession, I would first inquire into the nature of the conduct involved, here, prayer. The majority suggests that *all* prayer is "inherently religious." I disagree. Whether something is "inherently religious" depends on one's point of view. An invocation that takes the form of a prayer may have a dual nature: to some listeners it will be religious, while to others it will be merely ceremonial. However, because defendants concede that this prayer is a religious activity, we need not decide the issue.

inquiry. The United States Supreme Court recognizes that to "[f]ocus exclusively on the religious component of any activity would inevitably lead to its invalidation." *Lynch v. Donnelly,* 465 US 668, 680, 104 S Ct 1355, 79 L Ed 2d 604 (1984).[2] Indeed, I find it hard to imagine that there would ever be an Establishment Clause challenge to anything that was not, at its core, religious.

The proper inquiry is not into the nature of the challenged conduct; the controlling issue is whether the purpose for which the religious activity is being used is clearly secular. In *Eugene Sand & Gravel v. City of Eugene, supra,* a large cross was being maintained on city property. The Supreme Court explained that the question was *not* whether the cross was a religious symbol, but whether, under the circumstances, the *display* of the cross on city-owned property satisfied the "clearly secular purpose" test. 276 Or at 1012. Accordingly, we look at the purpose for which something of religious character is being used.

In order to discern the school's intention in choosing an invocation to open the ceremony, we must review the evidence. Although the majority acknowledges that there is evidence that the purpose of the invocation is secular, the thrust of the majority's approach is that the evidence is immaterial, because prayer is by its nature religious and, therefore, the purpose for which it is being used must necessarily be religious.[3] There may be more than one purpose for governmental action. The issue, however, is not whether one of the purposes is religious, but rather whether there is a "clearly secular purpose" as well.[4] There is no need to have an

---

[2]Those federal courts that have considered Establishment Clause challenges to prayers do not automatically invalidate the activity simply because it is prayer, as the majority here would require. *See, e.g.,* n 10, *infra.* The United States Supreme Court recognizes that prayer in a public setting may be unobjectionable when its use has a traditional, historical basis. *Marsh v. Chambers,* 463 US 783, 103 S Ct 3330, 77 L Ed 2d 1019 (1983).

[3]This approach views the activity objectively. Although such a standard is appropriate when determining the effect portion of the test, it is not properly applied here. Subjective intent, while not necessarily determinative, is relevant to discern actual purpose. See *Lynch v. Donnelly, supra,* 465 US at 690 (O'Connor, J., concurring).

[4]Even when the benefit to religion is substantial, the conduct may be constitutionally permissible if a secular purpose is demonstrated. *Lynch v. Donnelly, supra,* 465 US at 680.

*exclusively* secular purpose. *Lynch v. Donnelly, supra,* 465 US at 681 n 6. Conduct that is motivated in part by a religious purpose may satisfy the requirement. It must be invalidated, however, if it is *"entirely* motivated by a purpose to advance religion." *Wallace v. Jaffree,* 472 US ___, 105 S Ct 2479, 86 L Ed 2d 29, 43 (1985) (emphasis supplied; footnote omitted). *See also Lynch v. Donnelly, supra,* 465 US at 680 (governmental conduct invalidated only where "activity was motivated wholly by religious considerations"); *but cf. Stone v. Graham,* 449 US 39, 101 S Ct 192, 69 L Ed 2d 199 (1980) (even though state had some secular objectives, posting of Ten Commandments in schools violated purpose test because religious purposes were dominant).

No one would question that the purpose of the commencement ceremony itself is secular: to provide a solemn occasion for the presentation of diplomas and other awards. The purpose for opening the ceremony with an invocation, then, must be viewed in that context. The school chose an invocation for various reasons. The principal of the high school testified that an invocation was chosen to add a note of dignity, decorum and solemnity to the occasion. He also recounted that the high school had traditionally used an invocation as a ceremonial, formal way of opening commencement exercises. The United States Supreme Court has indicated that certain government acknowledgments of religion serve "the legitimate secular [purpose] of solemnizing public occasions." *Lynch v. Donnelly, supra,* 465 US at 693 (O'Connor, J., concurring). Tradition and history are also legitimate secular purposes for the use of prayer in public ceremonies. *In Marsh v. Chambers, supra,* although the Court did not specifically apply the three-part test, it upheld the practice of opening a state legislature with a prayer because of history and long tradition. Although I agree that defendants may have had some religious purpose for including an invocation in the commencement exercises, it is clear to me from the evidence that any such purpose was neither exclusive nor predominant. Therefore, because there were legitimate, clearly secular purposes shown by the evidence, I would find that defendants have satisfied the first requirement of the three-part test.

### (2) *Primary Effect*

Next, governmental conduct may be invalidated when it has a primary effect, as opposed to an incidental

effect, that either advances or inhibits religion. The effect of governmental conduct should be viewed objectively and in the context in which it occurs. Conduct can have a clearly secular purpose, but if it actually advances or inhibits or, viewed objectively, would be perceived as advancing or inhibiting religion, it fails to pass constitutional muster. However, we must keep in mind that, when the effect merely happens to coincide or harmonize with the tenets of some religions, the constitutional guarantees are not violated. *See Lynch v. Donnelly, supra,* 465 US at 682; *Marsh v. Chambers, supra,* 463 US at 792. Even before its adoption of the three-part test, the Oregon Supreme Court recognized that Article I, section 5, of the Oregon Constitution does not prohibit the state from conferring *any* benefit upon religion. The principle of separation of church and state is not that strict; a certain amount of interplay is permissible. *Dickman et al v. School Dist. 62C et al,* 232 Or 238, 247, 366 P2d 533 (1961), *cert den* 371 US 823 (1962).

It is the primary, and not any incidental, effect that is at issue. Viewing objectively the facts developed below, I would hold that the primary effect of the proposed invocation was not to advance or inhibit religion. The use of an invocation does not actually advance religion. The anticipated audience at the ceremony included honored seniors, their families and guests. The graduates[5] are on the brink of adulthood; parents and most of the guests are adults. There is little likelihood that the school's use of an invocation would actually advance religion, because those who would hear it were of sufficient maturity that they were not readily susceptible to religious indoctrination. In *Marsh v. Chambers, supra,* the maturity of the audience was one factor considered by the court in upholding the use of prayers in state legislative chambers. 463 US at 792.

Neither would there be a perception that the school was advancing religion. The fact that a school employe, a senior teacher, was to give the invocation does not make the primary effect that of advancing religion. Indeed, use of clergy to offer an invocation in a similar situation would give more of

---

[5]The students had already fulfilled the educational requirements and had officially graduated; the commencement exercises were merely a ceremonial way of publicly conferring the diplomas.

an impression of advancing religion, yet just such a practice has been upheld.[6] Because the purpose of commencement is not pedagogical, but merely ceremonial, the audience would not have arrived at the auditorium seeking instruction, and a short invocation would not be perceived as an attempt to advance religious teachings. In this case, there was no indication that the invocation opportunity was exploited to proselytize or to advance one or disparage any other faith or belief. The audience would leave the ceremony with the impression that they had witnessed a dignified and solemn occasion, not a religious service.

This once-a-year use of an approximately 90-second invocation is readily distinguishable from daily school prayer, which has been held to violate the Establishment Clause.[7] Many of the children involved in daily school prayer cases are much younger than these graduated seniors and much more impressionable. Their attendance at school is mandatory. Although some of the challenged school prayer laws allowed students to be excused if they or their parents so desired, a request to be excused needed to be sought affirmatively, and the mere request might stigmatize the student. The commencement exercises we review, however, are totally voluntary;[8] they are not a part of the school's educational program. Students graduate whether or not they attend the ceremony. The commencement occurs but once a year, the invocation is a 90-second part of a two-hour ceremony, and a different audience is present each year. Although a repeated religious exercise such as daily school prayer might be coercive and give the impression that the state was encouraging religion, the commencement invocation here would be perceived, as it had throughout the history of the high school, as setting a solemn, dignified tone for the ceremony. Accordingly, while there may have been some incidental effect to advance religion, that was not the primary effect. Therefore, defendants have satisfied the second requirement.

---

[6] *E.g., Stein v. Plainwell Community Schools,* 610 F Supp 43 (WD Mich 1985).

[7] *See, e.g., Engel v. Vitale,* 370 US 421, 82 S Ct 1261, 8 L Ed 2d 601 (1962).

[8] Although I agree with the majority that the fact that attendance at the ceremony is voluntary is no "defense" to an Establishment Clause challenge, it is nonetheless one factor that should be considered when determining effect.

### (3) *Entanglement*

Finally, governmental conduct must avoid excessive entanglement with religion. This requirement is violated if the government participates in an active manner in planning and organizing religious activities. *Eugene Sand & Gravel v. City of Eugene, supra,* 276 Or at 1023. There is no serious challenge raised on this point. Defendants did not exercise any control over the content of the invocation.[9] The once-a-year ceremony did not involve any relations between local religious institutions and school officials, because clergy were not involved in the ceremony in any way. The teacher who was to deliver the invocation was not paid for her extra efforts, although she may have composed the invocation during work hours. These factors, along with the school's rental of the auditorium for the ceremony, hardly reach a level of "excessive entanglement."[10] Defendants have also satisfied the third and final requirement.

---

[9]This is unlike the Regent's Prayer invalidated in *Engel v. Vitale, supra,* where the state had composed an official prayer to be used in schools.

The majority, in footnote 3, mischaracterizes the evidence. The question put to Mr. Utz went not to the issue of control over content of the invocation, but to whether the majority rules in deciding the content of graduation ceremonies. The question was:

"Q. As a matter of fact, if every senior in the class but one wanted to have a Roman Catholic High Mass as part of graduation and only one objected, you would honor that objection, would you not?

"A. Well, you know, —

"Q. You would not?

"A. Well, yes, I would honor that objection."

There is, of course, a great difference between a Roman Catholic High Mass and a 90-second invocation.

[10]The majority of courts that have addressed the issue of whether it is constitutional to include an invocation or benediction at a graduation ceremony where attendance is voluntary have found no violation of the Establishment Clause or Free Exercise Clause of the First Amendment. *See Stein v. Plainwell Community Schools, supra* (upheld the use of invocation and benediction in graduation ceremonies when they were traditionally delivered by students or clergy); *Grossberg v. Deusebio,* 380 F Supp 285 (ED Va 1974) (upheld use of invocation and benediction at commencement exercises where school's past ceremonies had included similar activities, and senior class made decision to include them and paid expenses); *Wood v. Mt. Lebanon Township School District,* 342 F Supp 1293 (WD Penn 1972) (upheld use of invocation and benediction given by clergyman at graduation ceremony); *Wiest v. Mt. Lebanon School District,* 457 Pa 166, 320 A2d 362, *cert den* 419 US 967 (1974) (Pennsylvania Supreme Court held invocation and benediction delivered by clergy did not violate either the Pennsylvania Constitution or the Establishment Clause of the First Amendment). At least one court has held the inclusion of an invocation or benediction at graduation violative of the First Amendment. *See Graham v. Central*

On the basis of this proper application of the three-part test, I would hold that defendants are entitled to prevail. Accordingly, I would reverse.

I am well aware that the issue presented by this case weighs very heavily on all citizens of this state. It is capable of evoking one's emotions as few others do. It is also a very troublesome one for judges—trial or appellate—who are called upon to decide it. From my own perspective, I cannot help but reflect on all the apparent inconsistencies that abound regarding the permissible interaction between church and state. The illustrations are limitless of how religion and government have been and still are intertwined. Our brothers and sisters in the legislative bodies sitting less than a block away from this court begin each legislative session with a prayer. Even in our own branch of government, references to God are not forbidden. The United States Supreme Court opens every session with the supplication, "God save the United States and this honorable court." State trial judges daily administer witness oaths invoking the name of God. Indeed, at this very court's most recent investiture, the new judge's clergyman offered a prayer. The executive branch of government issues coins and currency for nationwide use bearing the national motto "In God We Trust." School children across the country repeat a pledge of allegiance that affirms that we are "one nation under God." In view of this and other evidence of pervasive governmental tolerance for and, indeed, approval of religion, I find it hard to believe that the framers of this state's constitution

---

*Community Sch. Dist. of Decatur,* 608 F Supp 531 (SD Iowa 1985) (school board planned ceremony, at which Christian minister had delivered invocation and benediction for 20 years; court noted that prayer is inherently religious).

Plaintiffs cite *Doe v. Aldine Independent School Dist.,* 563 F Supp 883 (SD Tex 1982), for the proposition that prayer at commencement exercises violates the Establishment Clause, but fail to note that in that case the prayer was a formal school prayer posted in large black letters over the entrance to the gymnasium and that it was recited or sung at pep rallies and athletic contests as well as at graduation ceremonies. The court found that the prayer violated the Establishment Clause, because it failed all three parts of the *Lemon* test. In *Florey v. Sioux Falls School Dist. 49-5,* 619 F2d 1311 (8th Cir 1980), the school board had adopted a policy statement and rules that allowed the observance of holidays having both a religious and secular basis. The rules also contained a provision permitting invocations and benedictions in commencement ceremonies. Although the court found no violation of the Establishment Clause, the plaintiffs challenged only the rules relating to observance of religious holidays, not those relating to the invocation and benediction.

would fear that this 90-second invocation could somehow threaten to weaken the metaphorical wall separating church and state.

I have deep respect for the majority and its strong conviction as to the constitutional correctness of its decision. However, I feel with equal conviction that the majority has failed to analyze the facts properly and to apply the test that the Oregon Supreme Court has adopted. As a result, it has decided the case erroneously. The facts show that there is no danger here of a governmental establishment of religion of the type which the constitution was meant to prevent.[11] As Justice Goldberg said, concurring in *Abington School Dist. v. Schempp,* 374 US 203, 308, 83 S Ct 1560, 10 L Ed 2d 844 (1963):

> "It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow."

Respectfully, I dissent.

---

[11]The majority adds, in a footnote, that the commencement invocation also violates Article I, section 2, of the Oregon Constitution. If that holding is based on the fact that an identical analysis applies to challenges under Article I, sections 2, 3 and 5, I fail to see why section 3 is not mentioned. If the holding is not based on the three-part test, the majority should explain the basis for its conclusion.